# THE CITY OF HAGERSTOWN ET AL. *v.* LONG MEADOW SHOPPING CENTER ET AL.

[No. 163, September Term, 1971.]

*Decided February 15, 1972.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Kenneth J. Mackley* and *Robert E. Kuczynski,* with whom was *Edward Oswald, Jr.,* on the brief, for appellants.

*David W. Byron* and *John H. Urner,* with whom were *Byron, Moylan & Urner* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

The Long Meadow Shopping Center (Center), the subject of the controversy in this appeal, lies partially within and partially without the city limits of Hagerstown, Maryland, and is owned by one of the appellees in this case, a partnership doing business under the name of the Center and herein referred to as "Long Meadow." This appeal arises from the refusal of the Hagerstown Board of Zoning Appeals (Board) to grant Long Meadow and their general contractor, Callas Contractors, Inc., the other appellee, a building permit to construct a movie theater on that portion of the Center which is divided by the city limits' line separating Hagerstown from the

remainder of Washington County. The portion of the Center within Hagerstown is located on land shown on the comprehensive zoning map of the City as CSC (Community Shopping Center). Washington County has no zoning ordinance. The Board denied the permit, finding that the proposed use was not permitted in a CSC district, but on appeal the Circuit Court for Washington County (Rutledge, J.) reversed the Board, holding that the City was estopped to deny the issuance of the permit. The City of Hagerstown and five intervening local residents who live within two blocks of the Center have taken this appeal from the order of the court authorizing the appellees to proceed with the construction of the theater.

Before discussing the set of facts which give rise to the present appeal it will be helpful toward an understanding of the issues now before us to review the history of past litigation affecting Long Meadow.

On September 17, 1956, Long Meadow first made application for a building permit to construct the Center, and on the same day the City Building Inspector issued it. On September 25, 1956, however, a local resident filed an appeal to the Board protesting the issuance of the permit and after a public hearing the Board revoked the permit. At that time the Hagerstown Zoning Ordinance contained the following provisions:

> "Sec. 24.10 [1] *Community* Shopping Center Districts—Generally
>
> *Community* shopping center districts shall be designated as such on the zone district map. They shall be distributed geographically so that each major section or quadrant of the city may have the facilities which they are intended to provide. These districts are intended to provide *ordinary retail shopping facilities for adjacent*

---

1. In 1966 the Charter and Ordinances of the City of Hagerstown were recodified and Section 24 was renumbered Section 68 and this section as amended is now Section 68-10.

*and nearby residential neighborhoods,* where there may be purchased many *small articles,* various merchandise and services which meet the *average or daily needs of those who dwell in such neighborhoods,* * * *

* * *

6. Plans and such specifications as may be required for a *project* in any community shopping center district shall be submitted to the inspector of buildings and the city engineer for their inspection * * *. If such *project* is found by such officials to comply with the requirements of this article * * * the same shall be approved and a permit * * * issued * * *. If the proposal does not comply with the regulations of this section, the officials shall disapprove * * *." (Emphasis supplied)

In denying the permit the Board advanced the following reason for its action:

"* * * That Section 9 of the City Zoning Ordinance [then, Section 24.10 of The Code of The City of Hagerstown] * * * bearing the title, 'community shopping center districts' states * * * that such districts as contemplated by said ordinance are intended to provide *ordinary retail shopping facilities for adjacent and nearby residential neighborhoods where may be purchased many small articles, various merchandise and services which meet the average or ordinary daily needs of those who dwell in such neighborhoods.* That this Board finds as a fact that the shopping center for which said building permit was issued contemplates providing *extraordinary retail shopping facilities, not only for adjacent and nearby residential neighborhoods, but for a wide area extending far beyond such adjacent and nearby residential neighborhoods.*" (Emphasis supplied)

Long Meadow subsequently appealed the Board's decision to the Circuit Court for Washington County where the Board was affirmed. At this point, instead of prosecuting its appeal further, Long Meadow chose to seek redress through the legislative branch of the City government, and succeeded in obtaining from the City Council an amendment to Section 24-10 of the Zoning Ordinance, whereby, it was amended to read:

> "Sec. 24.10, Shopping Center Districts.
>
> "* * * These districts [shopping center districts] are intended to provide *various shopping facilities,* where may be purchased *various articles, merchandise and services* required by those who reside in the neighborhood and *elsewhere in the City of Hagerstown and surrounding trade area.* (Emphasis supplied)

It is interesting and significant to note that while the City Council amended the title of Section 24.10 (now Section 68.10) by deleting the word "Community," and amended the definition of a "Community Shopping Center," as originally provided in the Zoning Ordinance, the Zoning Map itself was in no way changed and while it may be argued that the ordinance as amended allows for facilities ofttimes found in a "Regional Shopping Center," there was no amendment of the classification of "CSC" (Community Shopping Center) on the legend of the Zoning Map. In this regard it should also be noted that there was no amendment to Subsection 6 of Section 24.10 (now Section 68-10) which continues to refer to "any community shopping center district." Elsewhere in the zoning ordinance shopping centers are continually referred to as "community shopping center districts." (See Section 68-5 titled "Districts Established; Map, * * * D. * * *") The best that may be said for the tortured construction of the amendment advocated by Long Meadow which would have us construe the amendment as creating a new classification, namely that of a

"Regional Shopping Center," for which it alleges a theater would not be a prohibited use, is that, in our opinion, the amendment only sets forth the policy as to permissible and nonpermissible uses within the type of shopping center described in the ordinance which certainly is applicable to Long Meadow.

With the above amendment, the way was now paved for the desired permit which Long Meadow acquired and construction was begun in 1956. The Center opened with a variety of stores including a large department store, two supermarkets, a bank, two dress shops, two shoe stores, a candy store, an automobile supply store, a jewelry store and a gasoline service station. There was no theater mentioned in the original plans which were approved by the Building Inspector in 1956.

At this juncture we should note that Section 24.12, now Section 68-12, remains the same. This section entitled "Prohibited Uses in Shopping Center Districts," provides:

"A. In all community shopping center districts, land and buildings shall not be used * * * for any one of the following specified uses:
* * *
(3) Retail Business Uses
(4) Service Uses
(a) Except insofar as Items (3) and (4) may be parts of the entire community shopping center project, integrated with other uses to make up the whole project and shown on the plans referred to in § 68-10."

Thus, although Retail Business Uses may be defined as including a theater and are allowed in a community shopping center where they are included in the original plan, yet, under the ordinance they are a prohibited use in the center if they are not in the original plan of the community shopping center as approved by the Building In-

spector. In another way it may be stated, that Retail Business Uses and Service Uses are permitted in a community shopping center district if they are contained in the original plan and initially approved by the City. (See Sections 68-13 and 68-15 of the Code of the City of Hagerstown (1966 ed.).)

We now pass through an interval of fourteen years which, at least from the record, appears to be quiescent insofar as litigation affecting Long Meadow is concerned. However, in 1969, Long Meadow experienced growing pains which culminated in its desire to demolish an existing store in the Center and construct a twin movie theater. Callas Contractors, Inc., negotiated for the contract to perform the work and endeavored to obtain from the City Building Inspector, Mr. Gerald Shank, the required building permit. Mr. Shank testified in the court below that he informed Mr. Michael Callas, the president of the construction company, that since the greater portion of the proposed structure would lie outside of the City limits, the City would require no building permit, and it would suffice if a permit were obtained from the Washington County Tax Assessor's Office. Mr. Shank further testified that this policy was dictated to him by the Mayor and City Council of Hagerstown and that it was passed along by him to his successor in office, Mr. Thurston A. Keltner. The record additionally reveals that Long Meadow's mortgagee desired assurance of the fact that the theater would not violate any local zoning ordinances, and that for this purpose Mr. Keltner drafted and delivered to Mr. Callas a letter which stated that no permit would be required by the City.

On March 2, 1969, Callas obtained a permit from the Washington County Tax Assessor and shortly thereafter employed an architect to prepare construction drawings.[2] Permits for electric, water and sewer connection and a

---

2. Washington County did not require a building permit in the context in which one is usually understood, the permit required being primarily for the purpose of alerting the Tax Assessor of improvements to property.

license to operate a motion picture theater were acquired from the City of Hagerstown, and on September 2, 1970, Callas Contractors, Inc. entered into a contract with Long Meadow to demolish the existing store and to construct the theater. Demolition work commenced on September 15, 1970, but was interrupted on September 21, 1970, when Mr. Keltner informed Callas that a demolition permit would be required by the City for the approximately one-fourth of the work being performed within the City limits. Upon arrival at Mr. Keltner's office to secure the demolition permit, Callas was further notified that Mr. Keltner thought that application should also be made for a building permit. On September 29, 1970, after the expenditure of $25,950.00 on the project and after Long Meadow had entered into a lease agreement with a tenant for the theater space, the applications for the demolition and building permits were denied by the Building. Inspector. Mr. Keltner's decision was subsequently appealed to the Board where it was found that a motion picture theater was not an allowable use under Sections 68-12, 68-13, and 68-15 of the City Zoning Ordinance in a community shopping center district. The Board further discussed the question of the application of the doctrine of estoppel against the City, preventing it from revoking the permit, stating:

> "The applicant and owner themselves both argue and contend that no building permit was ever issued because they were told one is not needed. Assuming for the moment that a permit was issued, it would have been a completely ultra vires act on the part of the Building Inspector and would not have been a valid permit. It is well settled that the Building Inspector must follow the building code and ordinances and an exercise of independent discretion that violates the terms of the same are not controlling. (*Zoning Law and Practice*, Yokley, Vol. 1, under Permits) * * *

* * * There can be no estoppel raised against the Board of Zoning Appeals or possibly the municipality, where one acts in reliance upon a permit invalidly issued by the administrative officer, where even the permittee had no knowledge of the invalidity. [Citing *Law of Zoning and Planning,* Rathkopf, Vol. 2, Ch. 56 and 57.-28, Section 12]."

On appeal of the Board's decision to the Circuit Court for Washington County, the lower court, although noting that "It is clear from an examination of the authorities that estoppel in zoning cases is rarely applied against municipalities," nonetheless, held that, "in the peculiar and unique circumstances of this case, estoppel should be applied * * *," and reversed the Board's decision assigning as its reasons:

"First, we are dealing with more than the zoning laws; we are dealing with a city policy. The existence of such a policy was proved to the satisfaction of the Court. The only effort to rebut the policy was the testimony of the city clerk who testified he did not know of any such policy. No mayor or former mayor or councilman or former councilman was called to testify. The present building inspector even testified that the policy has not been cancelled.

Second, more than three fourths of the proposed building would be outside the city limits in the unzoned county. The appellants could probably redesign the building so as to be wholly in the county, and could operate just as well as if one-fourth were inside the city limits. And there would be no difference in the increased traffic (which worries the intervenors). Hence, to force the appellants to redesign would be a costly burden on them, and in the end would not accomplish what the city and intervenors seek to prevent."

Predicated upon the above rationale, the lower court ordered the City Building Inspector to issue the building permit. It should be noted that pending the appeal to this Court, work was resumed on March 24, 1971, and after an expenditure of some $200,000.00, the theater was opened to the public on August 18, 1971. This latter turn of events has prompted Long Meadow, in addition to relying upon the doctrine of estoppel against the City of Hagerstown, as it did before the Board and the lower court, to now raise the issue of "mootness" and that by failing to file a supersedeas bond, the City permitted the completion of the building, and that the rights of the lessee who was not a party to the present proceedings may not presently be affected by a contrary ruling of this Court.

Addressing ourselves first to the merits of the case, we think the lower court erred, if not in its finding of facts, then at least in its application of the law to the facts. We are fully aware that under Maryland Rule 886 we are obliged to accept the finding of facts of the lower court unless they be clearly erroneous. In the instant case the chancellor found as a matter of fact that a policy existed whereby the City waived the requirement for a building permit in those cases where the major portion of the proposed structure would be outside the City limits. A close scrutiny of the record fails to reveal any formal or informal action ever taken by the Mayor and City Council whereby an official declaration was ever made as to such a policy as here described. In this regard, the best that may be said in support of the existence of such an alleged policy is that Mr. Keltner, the Building Inspector, who finally drafted the letter informing the contractor that no permit was needed, testified that he understood from his predecessor, Mr. Gerald Shank, that such was the City's policy and Mr. Shank testified in substance, that he had never seen any such an instruction on policy in writing but that he had an understanding regarding this with one or more different Mayors and one or more different Councils. On the other hand, the City Clerk,

Mr. Conrad, who has occupied this position since June of 1962, had never heard of any verbal or written policy to this effect. However, if we assume, without conceding it to be a fact, that such a policy existed, we do not believe that such a nebulous understanding can serve as the basis on which to predicate estoppel. It must be noted that such a policy would be running contrary to the duly ordained section of the City Code which requires a building permit prior to the commencement of a structure in the City. Section 68-28, Code of the City of Hagerstown (1966 ed.). We would further note that the status of the policy testified to by Mr. Shank and Mr. Keltner has never ascended above the level of a verbal understanding. In this regard we think the comments of Professor McQuillin in his work *Municipal Corporations,* Vol. 5, §§ 15.02, 15.-03, p. 42 et seq. (3rd ed. 1969), wherein he discusses the degree of sanctity to be accorded a resolution (and the policy in question certainly never achieved the status of a resolution) is quite pertinent:

> "A 'resolution' is not an 'ordinance,' and there is a distinction between the two terms as they are commonly used in charters. A resolution ordinarily denotes something less solemn or formal than, or not rising to the dignity of, an ordinance. The term 'ordinance' means something more than a mere verbal motion or resolution, adopted, subsequently reduced to writing, and entered on the minutes and made a part of the record of the acting body. * * *
>
> * * *
>
> A resolution in effect encompasses all actions of the municipal body other than ordinances. Whether the municipal body should do a particular thing by resolution or ordinance depends upon the forms to be observed in doing the thing and upon the proper construction of the charter. In this connection it may be observed that a resolution deals with matters of a special or

temporary character; an ordinance prescribes some permanent rule of conduct or government, to continue in force until the ordinance is repealed. An ordinance is distinctively a legislative act; * * *

* * *

* * * It may further be stated broadly that charters contemplate that all legislation creating liability or affecting in any important or material manner the people of the municipality should be enacted by ordinances, whether the city is acting in its governmental or private capacity. Whenever the controlling law directs the legislative body to do a particular thing in a certain manner the thing must be done in that manner. * * *

* * *

* * * *But a municipal corporation cannot accomplish by resolution or order, at least by one that is not equivalent to an ordinance, that which, under its charter, it can do only by an ordinance.* * * *

* * *

* * * So, where the charter provides that a particular power shall be exercised by ordinance, its exercise in any other manner, as by contract or resolution, would not be legal. At least, a 'resolution,' 'order,' or other form of action can accomplish the act, exercise of power, or purpose only where it meets all the requirements of; and is in fact, an ordinance." (Emphasis supplied)

In this case to endow the City Building Inspector with the authority to waive the requirement of the building permit would take an amendment of Section 68-28 of the Code and this could only be accomplished by way of an ordinance. In addition, we are of the opinion that regulations of this nature could only be enacted by the governing body of the City pursuant to Section 26 of its

Charter. Accordingly, assuming, *arguendo,* that the questioned policy did exist, short of its being incorporated into an ordinance, we do not think the City would be bound by it.

The strongest argument made by Long Meadow was by way of analogy to the existence of a policy whereby the City did not tax buildings lying partly within and partly without its corporate limits, if a greater portion of the building lay outside the City limits. A judicial review of this policy is not presently before us and our passing comment would be that Section 32 of the City Charter provides, that the assessment of real estate divided by City boundaries be apportioned so as to place a fair valuation on that within the City. We would further note that the field of tax assessments is of a different character from that of zoning and building permits.

Nor do we think the facts of this case permit the successful use of the argument that the Building Inspector was following a long standing administrative interpretation when he informed Callas and Long Meadow that no building permit was required. This rule, when applicable, must be bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance, which latter element is not here present. See *State Department of Assessments and Taxation v. Town and Country Woodmoor, Inc.,* 256 Md. 584, 589, 261 A. 2d 168 (1970) ; *Berwyn Heights v. Rogers,* 228 Md. 271, 279, 179 A. 2d 712 (1962).

The Board which originally heard the request for the permit, noted that this was a hard case, with sympathy flowing toward Long Meadow, because of its reliance upon faulty advice from a source from which it should have expected better and that it did so at substantial detriment to itself. We also recognize the hardship presented by this case, however, we are faced with the realization that to affirm the decision of the chancellor below would unsettle a principle of law which has become stabilized in this jurisdiction by application in many cases.

Although the City issued no permit in the case at bar,

nonetheless, the contractor and Long Meadow were told that it was all right for them to proceed without a permit. Accordingly, we view their position as being at least as well off as one who has been issued a permit. Certainly, their standing in court should be no better.

The basic principles of law applicable to the situation wherein the property owner proceeds with plans or construction after receiving a building permit which has been invalidly or mistakenly issued, was fully discussed in *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933). That case involved the issuance of a building permit authorizing the applicant to construct an ice house in a zone where such a building was specifically prohibited by law. The applicant set up the defense of estoppel against the city's efforts to obtain an injunction to enjoin the work. This Court, speaking through Judge Parke, said at pp. 227-28:

"* * * A permit thus issued without the official power to grant does not, under any principle of estoppel, prevent the permit from being unlawful nor from being denounced by the municipality because of its illegality. In the issuance of permits pursuant to the ordinance at bar, the municipality was not acting in any proprietary capacity nor in the exercise of its contractual powers, but in the discharge of a governmental function through its public officers of limited authority, and the doctrine of equitable estoppel cannot be here invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or agents which has been relied on by the third party to his detriment. *Every one dealing with the officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers,* and therefore such a person cannot be considered to have been deceived or

misled by their acts when done without legal authority." (Emphasis supplied.)

In *Berwyn Heights, supra,* this Court after noting the situations wherein estoppel in pais may operate against a municipality when the act upon which the estoppel is based occurred while an agent or officer of the municipality was acting within the scope of his authority, went on to state:

> "* * * However, the cases and text-writers very generally state that a municipality is not estopped to set up the illegality of a permit. *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743; 2 Metzenbaum, op. cit., pp. 1143-1146, 1191, 1192; 1 Metzenbaum, op. cit., pp. 163-171, 256-259, 466, 590, 591; 8 McQuillin, op. cit., §§ 25.153; *Vogt v. Borough of Port Vue,* 85 A. 2d 688 (Pa. Super.); *Adler v. Department of Parks & Public Property,* 89 A. 2d 704 (N. J. Super.). And the issuance of an illegal permit creates no 'vested rights' in the permittee, 2 Metzenbaum op. cit., pp. 1185, 1186, 1193-1195; 8 McQuillin, op. cit., § 25.153; *Colonial Beacon Oil Co., Inc. v. Finn,* 283 N.Y.S. 384; *Vogt v. Borough of Port Vue,* supra; cf. *Lipsitz v. Parr, supra.* We have held above that the permits issued to the appellee were in violation of the zoning ordinance; consequently they were unlawful and did not estop the appellant from prosecuting this suit." 228 Md. at 280.

To the array of cases cited in *Lipsitz* and *Berwyn Heights* should be added *Ross v. Montgomery County,* 252 Md. 497, 504, 250 A. 2d 635 (1969); *Kent County v. Abel,* 246 Md. 395, 399-403, 228 A. 2d 247 (1967) and authorities cited therein; *Gontrum v. City of Baltimore,* 182 Md. 370, 375, 35 A. 2d 128 (1943); *Godson v. Town of Surfside,* 8 So. 2d 497, 498-500 (Fla. 1942); *Amarillo v. Stapf,* 101 S.W.2d 229, 232 (Tex. 1937); *Pallman v.*

*East Haven,* 67 A. 2d 560, 563 (Conn. 1949) ; See also the annotation in 1 A.L.R.2d 338 (1948), *Estoppel— Governmental Bodies,* at 351 (authority to the contrary at 360) ; and *Later Case Service,* 1 A.L.R.2d, at 51 (1971) at 64 et seq. and cases cited therein. We would also call to mind that the instant case does not present the situation wherein the use classification of the property was changed by ordinance after the owner had substantially changed his position in reliance on the existing classification. See the language of this Court in *Baltimore v. Shapiro,* 187 Md. 623, 634, 51 A. 2d 273 (1947). McQuillin summarizes the situation in rather strong language, stating:

> "* * * In issuing a permit officials are discharging a governmental function, and the city and its citizens cannot be bound or estopped by the unauthorized acts of its officers in pursuance of that function. Indeed, the doctrine of estoppel will not be invoked, even though a substantial amount of work had been done on the property without official interference." McQuillin, *Municipal Corporations,* Vol. 8, § 25.153, at 489 (1965 Rev. Vol.).

The above cases and authorities are apposite to the case at bar and persuade us, that despite the hardship which will evolve on Long Meadow, we must reverse the decision of the chancellor below. The apparent harshness of this ruling should be ameliorated by the consideration that the major portion of expense incurred by Long Meadow was the result of the construction which it undertook while the decision of the lower court was pending review on appeal. Thus, in a way, Long Meadow embarked on a calculated risk.

We would further add that there is nothing stated in this opinion which is intended to prohibit Long Meadow from making use of that portion of the building lying within the City limits in a manner which conforms to the Zoning Ordinance, or to use that portion lying in the

County for theater purposes. In that context the protesting property owners may have won only a Pyrrhic victory.

Long Meadow would justify its continuation of construction during the pendency of the appeal on the premise that the City by failing to file a supersedeas bond (pursuant to Rule 817) staying the execution of the Circuit Court's order, in effect acquiesced in the construction of the theater for the intended use and the issue as to its being a prohibited use is now moot. Long Meadow would also cast the lessee of the theater, who is not a party to these proceedings, in a role to be equated with that of a bona fide purchaser in a challenged mortgage foreclosure proceedings, who prevails unless the objector to the ratification files a supersedeas bond, even though he may know that a claim is being asserted against ratification. *Lowe v. Lowe,* 219 Md. 365, 368, 149 A. 2d 382 (1959).

In measuring the thrust of this last argument we would first point out the analogizing the lessee of the theater in this case to a bona fide purchaser at a mortgage foreclosure fails, for the simple reason, that in the case at bar, it may well be that the lessee may yet enjoy substantial performance of the lease in occupying that portion of the premises outside the city limits. The lease was never filed as an exhibit in these proceedings, at least it is not to be found in the record. We have no way of ascertaining Long Meadow's obligations or the lessee's rights under the agreement, nor was the lessee ever a party to these proceedings. We do make the observation, however, that unlike the bona fide purchaser at a mortgage foreclosure who enters the picture at that stage of the proceedings, here, from the undisputed testimony of Mr. Callas, the contractor, it would appear that the lessee (Interstate Theater Corporation) had been negotiating with Long Meadow on a tentative lease before the contract was ever let to Callas or the demolition commenced or the subsequent construction started. It is difficult to see how we are presented here with the inter-

vening rights of innocent parties. Indeed, we find the language of this Court in *Durst v. Durst*, 225 Md. 175, 182, 169 A. 2d 755 (1961) as expressed by Judge Sybert to be strikingly applicable:

> "Appellee maintains, however, that the question raised on appeal is moot. His contention is that the appellant failed to stay execution of the judgment by filing a supersedeas bond as provided by Maryland Rule 817 and that accordingly the judgment was 'executed' when the Clerk of the Circuit Court delivered possession of the insurance policy to the appellee four days after the order of appeal was filed. * * *
>
> We think that on the facts of this case the contention is without merit. The cases cited by appellee involve intervening rights of innocent purchasers of real property at mortgage and judicial sales. In the case before us there are no intervening innocent parties to protect but a bona fide dispute and rights which remain to be decided. This Court, in *Lloyd v. Supervisors of Elections*, 206 Md. 36, 111 A. 2d 379 (1954), discussed the principles relating to the question of mootness and held that we will dismiss an appeal if it is beyond our power to make a decision in the case which will bind any of the parties to it or accomplish any of the purposes for which it was brought or defended. Here, the parties are still in court, and amenable to court orders in the event of a reversal. Therefore, the question involved in this case is not moot. *Maddox v. District Supply, Inc.*, 222 Md. 31, 158 A. 2d 650 (1960)." 225 Md. at 182.

Finding nothing moot about the issues here involved, we reverse the order of the chancellor.

*Order reversed, appellees to pay costs.*