# ARUNDEL SUPPLY CORPORATION ET AL. *v.* CASON ET AL.

[No. 309, September Term, 1971.]

*Decided April 12, 1972.*

*Motion for rehearing filed May 8, 1972; denied May 16, 1972.*

372

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SMITH, JJ.

*James M. Greenan,* with whom were *Charles M. Cockerill* and *L. David Ritter* on the brief, for appellants.

*J. Willard Nalls, Jr.,* with whom were *Walter H. Maloney, Jr., Prince George's County Attorney* and *Jess J. Smith, Jr., Associate County Attorney,* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

The locale is that part of Prince George's County between Andrews Air Force Base and the southeastern boundary of the District of Columbia. Some of the appellees live in District Heights; some live in Capital Heights. Lying generally between those two communities is the 16 acre tract upon which Arundel began washing and screening gravel in 1947. Over the years, and at least as early as 1959, residents of the area complained about the noise, the dust, the mosquitoes, and the tract's unfenced and unguarded ponds, but their complaints fell upon deaf ears. In August 1970 the appellees, claiming to represent over 2,000 householders, filed their bill of complaint seeking an order enjoining the continuance of Arundel's operation. After many preliminary sorties the case came on for trial, on 18 March 1971, before the chancellor, Powers, J. (now C. J.). The decree enjoining Arundel

> "from the establishment or continuance of a
> sand and gravel washing and screening process,

the establishment or continuance of the construction of hoppers, or the continuance of the use of hoppers except for the prompt removal of materials presently on the site; the hauling in of materials or the production of various grades of sand and gravel, and any step in the production, for sale, of concrete on the property leased or owned by the defendants described in the Bill of Complaint heretofore filed in this cause * * *"

was filed on 11 November. Arundel's appeal was filed promptly.

The 16 acre tract had been placed in the residential classification when the first zoning ordinance was enacted in 1928. It was continued in that classification by the 1930 and 1942 ordinances. The use of land as a "Gravel Pit" was permitted in residential zones by the 1928, 1930 and 1942 ordinances, each of which also permitted "[a]ccessory buildings and uses incident to any of the * * * [permitted] uses when located on the same lot and not involving the conduct of a retail business, except * * * [the sale of farm products]." [1] The 1942 ordinance contained a provision which permitted, in the "E" Industrial Zone, the use of premises "for any purpose whatsoever" except that a special ordinance was required for any use which, in the opinion of the Maryland-National Capital Park and Planning Commission, might become "noxious or offensive by reason of the emission of odor, dust, smoke, gas or noise." [2]

Arundel began the mining of sand and gravel on the tract in November 1946 and, as has been said, it installed and operated a screening and washing plant soon thereafter. At first only the materials mined on the 16 acre tract were processed but after a year or two, when that supply was exhausted, Arundel began to fetch to the property materials mined at other locations. Batching

1. Section III A 29.
2. Section VII A 55.

equipment also was installed for use in the preparation, sale and distribution of ready-mixed concrete. Since then, and until November 1971, the washing and screening of sand and gravel and the batching of sand, gravel and cement, all transported to the property from other locations, continued without interruption.

In 1949 the 1942 ordinance was superseded by one more detailed and more comprehensive. Any use which, by reason of the emission of odor, dust, smoke, gas or noise would be noxious or offensive was prohibited in the R-R Zone by the new ordinance.[3] A use involving the extraction of sand, gravel or other natural material required a special exception.[4] Such a special exception, however, did not permit the "use of heavy machinery; washing, refining, or other processing * * *."[5] "Such operations * * * [were permissible] *only* in an I-2 (Heavy Industrial) Zone."[6]

Judge Powers, in his opinion, has provided us with a few observations on the sand and gravel business as it pertains to Prince George's County. He said:

> "The reason for permitting a gravel pit in a residential area originally is apparent because deposits of sand and gravel occur by an act of nature and unlike locating a store, an industrial plant or an apartment building, the removal of natural deposits can be carried on only where found.

> "Numerous deposits of sand and gravel occur in this County and the product of these deposits is in great demand for highway, bridge and building construction which has been a major local industry for many years. Such deposits are usually located on unimproved property which might require substantial grading prior to any development. It is apparent that

3. Section 13.1.
4. Section 13.11.
5. Section 28.334a.
6. Section 28.334a.

the use of such valuable deposits is important to the economy and if properly accomplished, often results in the enhancement of the value of the land so utilized. Thus, it is frequent that permitting the removal helps many without hurting anyone. Abuses have resulted in more stringent control so that at present there must be no objectionable dust, smoke, noise or vibration, the land must be left suitable for development, grading and erosion are controlled and a time limit is established. No such controls existed in 1947 when Arundel's operation began.

"On the other hand, the operation of a plant for the washing and processing of sand and gravel which is mined elsewhere does not depend on a particular location for its existence, and there seems little reason for permitting it to exist in a residential area. This is especially true when there is evidence that Arundel's operation in a residential area is unsightly, produces noises, and results in other activity, which is inconsistent with residential use, diminishes the value of property and generally works to the disadvantage of its neighbors."

It can hardly be doubted that Arundel's operations during 1948 and most of 1949 violated the provisions of the 1949 ordinance. But, argues Arundel, when the ordinance was enacted on 29 November 1949 its use of the property was a legal non-conforming use. It says, and of course it is true, that the 1942 ordinance permitted the operation of a gravel pit on the property. And, it continues, its washing and screening procedures were "accessory uses incident to" the permitted use. We shall discuss the several contentions advanced by Arundel in the order in which they have been presented in its brief.

### I.

Arundel raised the defense of laches in its demurrer to the bill of complaint and it could have done so in the

trial on the merits. It does so here. It says that, during the 24 years of its uninterrupted washing, screening and batching operations, no one sought an injunction. While this seems to be true there is, of course, evidence of much dissatisfaction and many complaints during the past decade. Arundel cites many cases in support of its contention that the appellees' suit is barred by laches but analysis suggests to us that all of them are distinguishable from the case at bar. Basic to the defense of laches is the need to show some disadvantage or prejudice to the party asserting it. *Bradford v. Futrell,* 225 Md. 512, 525 (1961), and *Niner v. Hanson,* 217 Md. 298, 309 (1958). There must be either prejudice or circumstances making it inequitable to grant the relief sought.

We are not persuaded that Arundel has been injured or prejudiced or that it has suffered any disadvantage because this action was instituted in 1970 rather than in 1948. Had the neighbors moved against Arundel in 1948 laches as a defense would not, of course, have been available to Arundel and, as we shall see, it is quite likely the neighbors would have prevailed. During the succeeding years Arundel has enjoyed an illegal operation that has been profitable; stockpiles on the property, at the time of trial, had and perhaps still have a value in excess of $1,000,000. That it should now be required to cease and desist its illegal operation can hardly be said to be inequitable. Indeed moving its machinery and equipment to another location will probably be less a hardship now than it would have been in 1948.

The appellees argue here, as they argued below, that the zoning ordinance in effect when the bill of complaint was filed provides that "each and every day during which" a violation continues "shall be deemed a separate misdemeanor," [7] that the 1942 ordinance provided that "each day's violation is hereby declared to be a separate offense hereunder," [8] that the same or a similar provision will be found in all of the intervening ordinances, and

7. Prince George's County Zoning Ordinance § 31.614 (1970).
8. Section XII.

that the defense of laches is not available in these circumstances. Whether it is or is not Judge Powers did not say and since the expression of an opinion in this regard is not required of us we shall go no further than to hold that there has been no showing of prejudice. *Hall v. Barlow Corp.*, 255 Md. 28, 44 (1969).

## II.

Arundel next challenges the validity of the 1942 ordinance, contending it is unreasonably vague. "Gravel Pit" is not defined, it says, and it points to the absence of any mention of a washing or screening plant. We see nothing vague or ambiguous in the term "Gravel Pit." Failure to define a word calls for the application of its ordinary meaning. *Williams v. Associated Professors of Loyola College*, 257 Md. 316, 328 (1970). In Black's Law Dictionary (Rev. 4th ed.) "gravel pit" is defined as "[a]n excavation from which gravel is removed." The Oxford English Dictionary defines "gravel-pit" as "an excavation from which gravel (or sand) is or has been obtained." If the absence of any mention of washing or screening in the 1942 ordinance signifies anything, we think it signifies a legislative intention to allow the extraction of sand and gravel simply because it happens to be there, but not to allow washing and screening. Such an intention seems to be supported by the prohibition, in the same ordinance, of

> "[a]ny kind of manufacture [in the "D" Commercial Zone] other than manufacture clearly incident to a retail business conducted on the premises, or any manufacture or treatment which would constitute a nuisance."
> § VI A (5) (m).

The plausibility of what we have said is enhanced by the fact that under the 1949 ordinance washing, screening and batching required a highly restrictive special exception.

But, says Arundel, the 1942 ordinance made washing

and screening an accessory use. We are not persuaded that this is so any more than we could be persuaded that a commercial bakery in an agricultural zone could be said to be a use accessory to the raising of wheat. Moreover the section authorizing accessory uses excludes anything involving the conduct of a "retail business" and, unless we are greatly mistaken, Arundel, between 1942 and 1949, sold at retail, from the property, large quantities of sand and gravel to the ultimate consumer. Whether the washing and screening of the sand and gravel extracted from the 16 acre tract in 1946 was an accessory use we shall not undertake to say. We do not think, however, that the washing, screening and batching of materials "trucked in" from other places was an accessory use and we so hold.

### III.

Arundel produced Sam Bevard as a witness and offered to have him testify that Arundel, from 1946 to 1949, was doing only what everyone in the sand and gravel business was doing. Customs and usage are admissible, it argues, to ascertain the intention of the legislative body when the language of the ordinance is vague or ambiguous, citing *Frazier v. Warfield,* 13 Md. 279, 303 (1859). It is fundamental, however, that no custom, however long and widely followed, can nullify the clear and manifest meaning of the statute. *Comptroller v. American Cyanamid Co.,* 240 Md. 491, 506 (1965); *Bouse v. Hutzler,* 180 Md. 682, 687 (1942). Judge Powers, correctly we think, sustained the objection to Bevard's testimony. His comment, at the time, is interesting. He said:

> "I don't see how you could do that any more than you could show that there had been sixty gang killings in a certain area and therefore it showed that the area tolerated murder, and on a murder trial there was no reason why you should hold the man guilty of murder. That is

an extreme example, but I am only using that to illustrate the point that a custom in the business may have been a violation and it may have been a tolerated violation, but that doesn't make it legal."

The 1942 ordinance, as we have said, is neither vague nor ambiguous.

## IV.

In 1956 Arundel obtained from the Department of Building Inspection of the County Commissioners a "Use and Occupancy Permit" for the purpose of using on the 16 acre tract a "Gravel Washing & screening plant." Judge Powers's signing and filing of the decree connotes a finding that the issuance of the permit was erroneous. But Arundel insists it was error to grant the injunction without giving it an opportunity to "seek validation of its permit pursuant to Section 12.5 of the [1970] Zoning Ordinance." This seems to us to be utterly without merit. We do not see how the Commission (District Council) could validate a use the chancellor has declared to be illegal. Indeed to ask the question is to answer it. *Cf. Hagerstown v. Long Meadow Shopping Center,* 264 Md. 481 (1972).

## V.

Arundel's final contention is that Judge Powers's decree does not comply with the requirements of Maryland Rule BB78 a which is as follows:

"An order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; and shall describe in reasonable detail, and not by reference to the complaint or other document, the act sought to be required or commanded or restrained or forbidden."

This does indeed seem to have some merit but on remand Judge Powers can revise the decree so as to satisfy the

requirements of the rule and the reasonable requests of counsel.

> *Case remanded for a revision of the decree conformable with the views stated in the opinion.*
> *As revised the decree is affirmed.*
> *Costs to be paid by the appellants.*