611 A.2d 993

**UNITED PARCEL SERVICE, INC., et al.**

v.

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

No. 315, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Sept. 2, 1992.

Henry R. Lord, Baltimore (Cynthia J. Morris and Piper & Marbury, on the brief), for appellants, UPS and Verbal Corp.

H. Russell Smouse (Jack L.B. Gohn, Whiteford, Taylor & Preston, Baltimore, H. Emslie Parks, County Atty., and Jack R. Sturgill, Jr., Asst. County Atty., Towson, on the brief), for appellant, Baltimore County, Md.

Peter Max Zimmerman (Phyllis Cole Friedman, on the brief), for appellee, People's Counsel.

J. Carroll Holzer and Holzer, Towson, (Maher, Demilio & Lee, on the brief), for appellee, Hupfer, et al.

Argued before WILNER, C.J., and MOYLAN and CATHELL, JJ.

MOYLAN, Judge.

The appellants are 1) United Parcel Service, Inc.; 2) Verbal Corporation, a United Parcel Service subsidiary; and 3) Baltimore County (hereinafter, collectively, "UPS"). The appellees are People's Counsel for Baltimore County and Paul Hupfer (hereinafter "Mr. Hupfer"). On July 29, 1988, a divided panel of the Baltimore County Board of Appeals rendered a zoning decision in favor of UPS. Mr. Hupfer appealed that ruling to the Circuit Court for Baltimore County. In circuit court on August 7, 1989, Judge Joseph F. Murphy, Jr. reversed the decision of the County Board of Appeals. Following a Motion to Alter or Amend that judgment and lengthy argument thereon, Judge Murphy, on October 23, 1990, issued his final Order, reaffirming his Order of August 7 and disposing, as well, of several other

open motions. UPS has brought the present appeal from that decision in the circuit court.

The case concerns the effort by UPS to establish a package center or parcel distribution facility ("facility") at 14402 York Road, north of Hunt Valley, in Baltimore County. The facility was to be situated on a 36–acre parcel purchased by UPS within the 247–acre Loveton Industrial Park ("Loveton"). Since 1973, Loveton has been zoned Manufacturing Light (ML), the second most intensive land use classification set forth in Baltimore County's zoning regulations.

Planning for construction of the facility at Loveton had begun in 1985, before UPS acquired the property. As part of the process, UPS contacted the County's Zoning Commissioner, Arnold Jablon, seeking to determine whether its proposed use for the site conformed with the County's zoning laws. UPS met with the Commissioner on June 14, 1985. At that meeting, UPS was informed by the Commissioner that the Manufacturing Light zoning in place at Loveton permitted UPS's use of the site as a warehouse and distribution center as a matter of right under the applicable zoning ordinances.

As a consequence of that meeting, UPS sent the Commissioner a letter dated July 8, 1985, seeking to confirm in writing the Commissioner's assessment of the UPS site. The Commissioner returned that same letter to UPS with the addition of a marginalium dated July 10, 1985, in which the Commissioner wrote, "The aforementioned use of this property zoned ML is one that is permitted as of right & is OK." This advice was given, of course, without prior notice to any of the neighbors in the area, without referral to any other agency, and thus without consideration of any point of view other than that of UPS. Thereafter, UPS (through its subsidiary, Verbal) purchased the property.

On July 3, 1986, UPS filed a building permit application, pursuant to Baltimore County zoning regulations. On August 18, 1986, the Commissioner approved the application.

The building permit was issued to UPS on October 28, 1986. Construction at the site commenced immediately.

In January of 1987, Mr. Hupfer, a resident in the neighborhood of the proposed facility, noticed that UPS was erecting a building in Loveton. Suspecting that the use of the structure might constitute a trucking facility, Mr. Hupfer began making inquiries as to the zoning of the Loveton tract. He learned 1) that Loveton was zoned "ML," and 2) that a trucking facility is permitted in such a zone only by way of special exception, the granting of which requires a public hearing. Believing that UPS was in the process of building an illegal trucking facility in Loveton without the required granting of a special exception and without the required hearing, Mr. Hupfer wrote a letter to the Zoning Commissioner on January 11, protesting the issuance of the building permit.

Mr. Hupfer captioned his letter:
"In Re Zoning Violation
United Parcel Service Trucking Facility
Loveton Industrial Park
York Road
Sparks Md. 21152
Alleged Violator:
McCormick Properties, Inc.
11011 McCormick Road
Hunt Valley Md. 21031."

He described with particularity the construction he observed, expressed the belief that UPS was proposing to operate a trucking terminal, which required a special exception and was not permitted as of right, and stated that he could find no record of a special exception having been granted. He contended as well that the facility would appear to violate the setback restrictions of § 410.2 of the county zoning regulations and that access to the site did not seem to comply with § 410.3.a.1 of the regulations as it did not appear that the county traffic department had prescribed the truck routes or performed any traffic impact

studies. Hupfer asked that his letter be considered "a formal recorded objection" to the development.

On January 19, 1987, the Zoning Commissioner responded to Mr. Hupfer, informing him that "[t]he property in question is zoned ML, which permits warehousing as of right" and that "[a]fter review of the UPS proposal, it was determined that the proposed use was and is in fact a warehouse, rather than a trucking facility as you suggest." He stated that traffic studies had been made "in the early 1970's" and asserted that the road network was *not* deficient. The Commissioner ended his letter with the statement, "I am more convinced than ever that the UPS is a warehouse operation and does not require a special exception."

On February 8, Mr. Hupfer appealed that decision of the Zoning Commissioner to the County Board of Appeals. He was joined in that appeal by the Sparks–Glencoe Community Association, the Sparks–Quaker Bottom Community Association, and the Alexander's Crossing Homeowners Association, Inc. UPS challenged the jurisdiction of the County Board of Appeals to hear the case, on the ground that the Zoning Commissioner's letter of January 19 was not an appealable event. The Board of Appeals held a hearing on April 29. It issued a partial decision, confirming its jurisdiction to entertain the appeal, on May 20. The Board of Appeals agreed that the January 19 letter was not an appealable event.

It further ruled, however, that the earlier marginalium of the Zoning Commissioner in 1985, confirming that the projected facility was a permitted use, was an event over which it (the Board of Appeals) had power of review. It reasoned that limitations had not run with respect to that critical *de facto* zoning determination, evidenced by the 1985 marginalium, because Mr. Hupfer was neither actually aware nor had he been put on reasonable notice that such a *de facto* determination had, indeed, been made. In a Memorandum Opinion, the Board of Appeals indicated that it would conduct a subsequent hearing on the merits of

whether the proposed facility was a permitted use or a special exception.

Before that further hearing on the zoning merits could be held, however, there followed a one-year interlude, in which UPS, then joined by Baltimore County, appealed that jurisdictional determination by the Board of Appeals to the circuit court. Hupfer, then joined by People's Counsel for Baltimore County, moved to dismiss the appeal to the circuit court on the grounds that the Board of Appeals' Order was a nonfinal interlocutory appeal. In the circuit court, Judge J. William Hinkel agreed that the Board's decision was not subject to "immediate judicial review" and granted Hupfer's Motion to Dismiss. UPS promptly appealed that ruling of Judge Hinkel to this Court.

In an unreported decision in the case of *Verbal Corp., et al. v. Paul Hupfer, et al.*, No. 1174, Sept. Term, 1987 (filed March 24, 1988), *cert. denied*, 313 Md. 31, 542 A.2d 858 (1988), we affirmed the decision of the circuit court to dismiss the appeal from the Board of Appeals. Our decision dealt only with the propriety of dismissing the appeal because of its nature as an interlocutory appeal from a nonfinal order. We did not address the merits of the jurisdictional question.

Upon the remand of the case to the County Board of Appeals, a hearing on the zoning merits was conducted that entailed eleven days of testimony. The ultimate issue was whether the trucking and transportation aspects of the planned operation constituted its primary use or whether that aspect was only secondary to some other primary use. In a split decision (2 to 1), the Board of Appeals on July 29, 1988 determined that the proposed primary use was not that of a trucking facility. It declined to identify, however, any other specific use, permitted as of right in an ML zone, as the primary use. The Board of Appeals reasoned, rather, that the undeniable trucking use was merely "accessory" to a combination of nine permitted uses: 1) fluid storage, 2) freight carrier usage, 3) fuel storage, 4) storage, 5) utility service, 6) utility storage, 7) parking lot and garage,

8) repair establishment, and 9) paint shop. The Board of Appeals, therefore, affirmed the Commissioner's issuance of the building permit. The dissenting vote identified the principal use as a trucking facility.

On August 26, Mr. Hupfer appealed that decision to the circuit court. On September 9, UPS cross-appealed, protesting the Board's jurisdictional determination and certain evidentiary rulings. Following extensive argument on March 17 and March 20, 1989, Judge Murphy filed his first Memorandum and Order on August 7, 1989. He reversed the decision of the County Board of Appeals, ruling that the proposed facility was, as a matter of law, a trucking facility. He reversed the finding of the County Board of Appeals on the issue of estoppel because this could not justify or save an illegal use. He remanded to the Board of Appeals for a hearing on the merits as to whether a special exception should be granted.

There followed a Motion to Alter or Amend the judgment and another lengthy argument. On October 23, 1990, Judge Murphy issued a second Memorandum and Order, reaffirming his earlier Order of August 7, 1989, and disposing of other open motions. He rejected the argument of UPS that the County Board of Appeals lacked jurisdiction to hear the case in the first instance because Mr. Hupfer had failed to appeal the granting of a building permit to UPS within thirty days of such granting. This appeal has followed from those collective determinations by Judge Murphy.

Before us are essentially three questions:

1. Whether Judge Murphy correctly reversed the decision of the County Board of Appeals on the zoning merits?,

2. Whether even an illegal zoning use by UPS is protected by estoppel, laches, waiver, or vested rights?, and

3. Whether the County Board of Appeals, in the first instance, was entitled to hear Mr. Hupfer's appeal from the determination of the Zoning Commissioner?

We look initially to the merits of Judge Murphy's ruling, as he considered the question of whether the use sought by UPS was a permitted use in the ML zone or was a use requiring the granting of a special exception. He determined, as a matter of law, that the proposed use was as a "trucking facility" requiring a special exception. Judge Murphy ruled:

"This Court adopts the Board's factual findings. It is the majority's reasoning that requires reversal. There can be no dispute about the operative facts of this case. Whether UPS is operating a 'trucking facility' presents a purely legal question."

With respect to the appropriate breadth of review to be engaged in by Judge Murphy in looking at the decision of the County Board of Appeals, the case of *United Steel Workers v. Bethlehem Steel,* 298 Md. 665, 472 A.2d 62 (1984), spelled out the critical distinction between 1) the familiar deference extended by an appellate court to the conclusions of a trial court and 2) the less deferential standard properly utilized by a trial court in reviewing a decision of an administrative agency. Judge Rodowsky explained for the Court of Appeals, 298 Md. at 679, 472 A.2d 62:

"Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of an agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency."

*See also Harford County v. Preston,* 322 Md. 493, 505, 588 A.2d 772 (1991); *People's Counsel for Baltimore County v. Mockard,* 73 Md.App. 340, 348–349, 533 A.2d 1344 (1987); *Ocean Hideaway Condominium Ass'n v. Boardwalk Plaza,* 68 Md.App. 650, 661–662, 515 A.2d 485 (1986).

In this case, therefore, we are relieved of any necessity even to consider whether the Board of Appeals' decision might have been sustainable under a theory that UPS's proposed use was as a warehouse (a permitted use), because that line of reasoning was not relied upon by the Board of Appeals.

In further distinguishing between the deference due the County Board of Appeals on its findings of fact and the *de novo* character of the circuit court's ruling on a question of law, Judge Murphy expressly relied upon the explanation of that difference recently articulated by *People's Counsel for Baltimore County v. Md. Marine Mfg. Co., Inc.*, 316 Md. 491, 496–497, 560 A.2d 32 (1989):

> "As we have frequently indicated, the order of an administrative agency must be upheld on judicial review if it is not based on an error of law, and if the agency's conclusions reasonably may be based upon the facts proven. *Ad + Soil, Inc. v. County Comm'rs.*, 307 Md. [307] 338–39, 513 A.2d 893 (1986). But *a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law. See, e.g., Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 835, 490 A.2d 1296 (1985); *Harford County v. McDonough*, 74 Md.App. 119, 122, 536 A.2d 724 (1988)." (emphasis supplied).

We are not dealing in this case with an instance of any second-guessing on Judge Murphy's part with respect to the fact-finding done by the County Board of Appeals. Indeed, Judge Murphy expressly indicated that he was adopting "the Board's factual findings." His subsequent reasoning confirmed that he did just that. In its Opinion of July 29, 1988, the County Board had pointed out that it had listened to eleven days of testimony; heard many witnesses, including expert witnesses; reviewed 109 exhibits; and made an on-site inspection. On the basis of that evidence, it made the following findings of fact:

> "The Board finds as a fact that this operation is a service business designed to sort and deliver parcels or

packages in a quick period of time. Upon delivery to the site, the goods, chattels or packages are completely manually handled. No cranes, chain falls, forklift trucks, etc. are ever used in the handling of these items. The means of delivery is by human operation of vehicles, some small and some large. Finding these vehicles to be trucks, we must apply the definitions of the B.C.Z.R. to our factual findings."

The dissenting member of the County Board made compatible findings of fact, with which the majority did not in any respect disagree:

"As the majority members of the Board agree, the first portion of that definition squarely fits the use and identity of the facility operated by UPS at Loveton. Unquestionably, UPS's Loveton facility includes 'a structure or land used or intended to be used primarily to accommodate the transfer of goods or chattels from trucks or truck trailers to other trucks or truck trailers or to vehicles of other types, in order to facilitate the transportation of such goods or chattels.' No matter how sophisticated the sorting procedure nor how modern the process, the fact of the matter is that the operation of UPS at its Loveton site is almost entirely directed at the transfer of goods or chattels from one truck (either step van or tractor trailer) to another."

Indeed, all parties found the description of UPS's basic operation that had been made by Judge Bishop for this Court in *United Parcel Service v. Comptroller,* 69 Md.App. 458, 461–462, 518 A.2d 164 (1986), to be both accurate and helpful:

"UPS operates a common carrier service that picks up, transports and delivers small parcels, packages and freight throughout the continental United States. To carry out its service in the most efficient manner, appellant has devised an elaborate delivery system consisting of fifty-eight districts, the boundaries of which are roughly contiguous with state borders or large metropolitan areas. Within each district, appellant has established a

network of package centers and 'hubs,' the latter of which are the major sorting centers that service the smaller package centers. The intricacies of UPS's delivery system were succinctly explained in the Tax Court's factual findings:

A typical package route, from origin to destination, would entail the following: a package is picked up by a delivery van at the shipper's address and is carried to the assigned package center where it is sorted for further travel. If the package is to be delivered to a destination point within the area covered by that package center, it is delivered the next day to that point by delivery van. If the package is destined to a point outside the package center area, it must then be routed to another package center before final delivery. This is accomplished through the use of tractor-trailers either by direct transfer from package center to package center, or the more likely situation, from package center to centrally-located hub, the major sorting center which services a number of package centers. At the hub, the package is sorted and loaded onto tractor-trailers and then transported to the hub servicing the destination package center. From there, it goes to the proper package center and finally to the destination itself. The final leg of the package's journey is by way of delivery van."

The undisputed evidence before the Appeals Board showed that the current Phase I of the proposed UPS facility has been developed on 12 of the 36 acres of the parcel. It contains 10 inbound and 13 outbound unloading doors. There is parking provided for nine tractors, 17 trailers, and 150 delivery trucks. There are seven truck repair bases, two trailer repair bases, one dual-bay wash tunnel, and areas for the underground storage of liquid fuel, waste oil, and motor oil. The UPS facility handles approximately 43,000 packages per day. The packages move quickly from an incoming truck to an outgoing truck and there is no storage.

Witnesses called by Mr. Hupfer testified that the UPS facility was engaged in a "cross dock loading" or "sorting" process, which is recognized in the industry as an essential function of a trucking facility. This testimony was offered, *inter alia*, to fend off UPS's effort to analogize its operation to warehouses and distribution centers (such as Giant Food or B. Green), which are involved in the storage of products and in the distribution of those products for sale either on or off the premises.

It was established that UPS is licensed by the Public Service Commission as a common carrier and by the Interstate Commerce Commission as a freight carrier.

In fending off another effort by UPS to analogize its facility to that of a United States Post Office, Gary Doyle, the Director of Field Operations of the United States Post Office, testified that the Loveton operation could not be equated with an ordinary post office, which is a "customer service retail outlet." The sorting and shipping operation carried on by the Loveton facility would be comparable, rather, to something like the Main Post Office of Baltimore City, which is a "major mail processing distribution center and truck terminal operation."

In terms of classic fact finding—the resolving of disputed credibilities, the weighing of evidence, the decision as to whether certain concrete realities do or do not exist—what has been described is the sum total of what the Board of Appeals had to work with. On the merits, it had to decide whether, upon those facts, the proposed facility was or was not a "trucking facility" requiring a special exception. The critical standard against which it weighed the evidence was § 101 of the Baltimore County Zoning Regulations, defining a "trucking facility:"

> "*Trucking facility:* A structure or land used or intended to be used primarily A) to accommodate the transfer of goods or chattels from trucks or truck trailers to other trucks or truck trailers or to vehicles of other types, in order to facilitate the transportation of such goods or chattels; or B) for truck or truck-trailer parking or stor-

age. A trucking facility may include as incidental uses only, sleeping quarters and other facilities for trucking personnel, facilities for the service or repair of vehicles or necessary space for the transitory storage of goods or chattels."

Measured against that definition, the facts clearly established a proposed trucking facility, as the Board of Appeals expressly found:

"When one applies the evidence in this hearing and the use of the structure and land at the UPS site, it clearly initially fits the description of a trucking facility."

In his Memorandum Opinion and Order of August 7, Judge Murphy focused on the critical criteria as to what is a "trucking facility":

"The definition of a trucking facility is functional rather than aesthetic or structural. The most attractive building imaginable is a trucking facility if (1) it is being used primarily to transfer goods from trucks to other trucks, and (2) these transfers are made in order to facilitate the transportation of such goods.

To determine whether the UPS parcel distribution center is really a trucking facility, only two questions are relevant: (1) 'What is going on there?' and (2) 'Why?' That the building is attractive and/or that the transfer process does not involve heavy equipment may be relevant to the issue of whether a special exception should be granted, but these facts are not relevant to the issue of whether the property is being used as a trucking facility."

To that point in his Opinion, Judge Murphy had done no more than adopt the first-level fact finding of the Board of Appeals. He had not engaged in any *de novo* fact finding of his own. He had extended to the Board of Appeals every bit of deference that it was due.

■ After having made these findings of fact, however, the Board of Appeals had itself then ventured into the more treacherous territory of legal ruling. It looked initially to

that part of § 101 of the County Zoning Regulations that carved out an exemption from the label of "trucking facility" for aspects of trucking serving as a mere "accessory use" to some other lawful use of the land:

"Land used for the parking, storage or repair of trucks *used as an accessory* to a lawful business or industrial use of the land that such parking or storage area forms a part of shall not be considered a trucking facility within the meaning of this definition." (emphasis supplied).

The Board of Appeals then engaged in what was indisputably some creative and imaginative lawmaking. It ruled that UPS's projected use of trucks was a mere accessory use. To be sure, the Board of Appeals could identify no other legitimate use that was the "primary use." All of the prior efforts of our case law to define "accessory use" had dealt only with a relativistic distinction between what was primary and what was accessory. *Kowalski v. Lamar,* 25 Md.App. 493, 334 A.2d 536 (1975); *Arundel Supply Corp. v. Cason,* 265 Md. 371, 377–378, 289 A.2d 585 (1972); *Carney v. Baltimore,* 201 Md. 130, 135–136, 93 A.2d 74 (1952); *County Comm'rs v. Zent,* 86 Md.App. 745, 758–770, 587 A.2d 1205 (1991).

Eschewing any effort to identify a permitted primary use to which the proposed trucking operation was accessory, however, the Board of Appeals instead culled out from the catalogue of 106 permitted uses in an ML zone, nine of those that represented various ancillary functions of the proposed trucking operation—things such as fuel storage, repair establishment, parking lot and garage, etc. It concluded that the nine permitted ancillary uses, in combination, actually constituted the primary use of the facility and that the trucking operation was, therefore, merely accessory to an assortment of its ancillary aspects. The whole was somehow less than the sum of some of its parts.

Judge Murphy initially ruled, quite properly in our judgment, that such an innovative interpreting of the zoning law was, indeed, a ruling of law rather than a finding of fact.

He concluded, moreover, that such a legal ruling was wrong. He reasoned and ruled as follows:

"This Court rejects the majority's conclusion of law that the parcel distribution center is permitted 'as an accessory to a lawful business.' A 'lawful business or industrial use' must be a principal use that does not violate the Zoning Regulations. The 'business' at issue is a trucking facility and cannot therefore be 'lawful' unless permitted by special exception.

In this case, each of the uses permitted as a matter of right is nothing more than a mere accessory to the trucking facility for which a special exception is required. The combination of those permitted uses found at the parcel distribution center cannot transform a trucking facility into a 'lawful business.' UPS is not in the fuel business. It is not in the storage business. It is not in the garage business. UPS is in the transportation business. Its Loveton operation is a trucking facility."

Judge Murphy's ruling was preeminently correct. If UPS were only precluded, for instance, from storing fuel or running a paint shop on the Loveton premises, it would easily find a way around those logistical inconveniences and the parcel delivery business would go uninterruptedly on. If, on the other hand, UPS were precluded from trucking parcels to and from the premises, neither the paint shop nor the fuel storage facility would long survive. These were mere incidents of UPS's overarching parcel delivery business. Neither singly nor collectively did they constitute a primary use to which the parcel delivery business was merely accessory. Judge Murphy concluded:

"On the facts presented to the Board, the UPS operation is a trucking facility for which a special exception is required."

We hold that that ruling was correct.

■ In its ruling in favor of UPS, the County Board of Appeals had also relied upon the alternative ground of equitable estoppel. It reasoned that UPS had relied upon

the advice and the subsequent marginalium of the Zoning Commissioner and had further relied upon the issuance of the building permit. It had dramatically altered its situation to its financial detriment on the basis of that reliance. The Board of Appeals ruled:

"The Board has also considered in determining whether this operation is a lawful business the equitable Doctrine of Estoppel. UPS applied for a building permit and on that permit stated that they were a parcel distribution center. The Board finds in addition to its factual finding by way of a combination of uses that this is a lawful business, that the question of estoppel would allow the use to be a lawful business and that the trucks were an accessory to that lawful business."

Judge Murphy ruled, however, that whatever equitable relief UPS may be entitled to when it subsequently seeks a special exception, such arguably equitable considerations can, in no event, transform a use only permitted by special exception into a use permitted as of right. Judge Murphy ruled:

"This Court also disagrees with the majority's conclusion that 'the Equitable Doctrine of Estoppel' requires that the trucking facility be permitted as a matter of right. Although it is true that UPS has made extensive expenditures in reliance upon positive acts of certain Baltimore County officials, 'estoppel does not arise should the act be in violation of law.' Lipsitz v. Parr, 164 Md. 222, 227, 164 A. 743, 745 (1933). There is no evidence in this record that County officials did anything other than follow a long standing interpretation of the Zoning Regulations, and in the absence of proof to the contrary, the doctrine of equitable estoppel might ultimately require that a special exception be granted. This doctrine, however, is a shield, not a sword. It must not be used to rewrite the Zoning Regulations. Equitable estoppel shields UPS from interruption until the Zoning Commissioner determines whether a special exception shall be permitted, but cannot transform a use permitted by spe-

cial exception only into a use permitted as a matter of right."

Judge Murphy's reliance upon *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933), is not misplaced. In *Lipsitz,* the appellant sought to restrain the Board of Zoning Appeals of Baltimore City, and others, from interfering with his utilization of a permit issued to him by a zoning official to erect a building in which he would manufacture ice. "The words of the permit unquestionably granted the plaintiff permission to erect an ice manufacturing building, and carried an endorsement that the use of the land and structure applied for was in conformity with the provisions of the zoning ordinance." 164 Md. at 224, 164 A. 743. The zoning authorities responded that "the permit ... was invalid and had been issued by mistake and without authority." *Id.* at 225, 164 A. 743. The plaintiff Lipsitz claimed that the zoning authorities were equitably estopped from interfering with his utilization of the permit upon which he had relied to his detriment. In ruling against him, the Court of Appeals held, 164 Md. at 227–228, 164 A. 743:

"A municipality may be estopped by the act of its officers if done within the scope and in the course of their authority or employment, but *estoppel does not arise should the act be in violation of law. Paragraph 31 of the ordinance forbade the officials of the municipality to grant the permit* which the plaintiff asked and obtained; ...

... [I]t was therefore unlawful for the officers and agents of the municipality to grant the permit, and it would be unlawful for the licensee to do what the purporting permit apparently sanctioned. *A permit thus issued without the official power to grant does not, under any principle of estoppel, prevent the permit from being unlawful nor from being denounced by the municipality* because of its illegality.... [T]he doctrine of equitable estoppel cannot be here invoked to defeat the municipality in the enforcement of its ordinances, because of an error or mistake committed by one of its officers or

agents which has been relied on by the third party to his detriment. Everyone dealing with the officers and agents of a municipality is charged with knowledge of the nature of their duties and the extent of their powers, and therefore such a person cannot be considered to have been deceived or misled by their acts when done without legal authority." (emphasis supplied).

*Lipsitz v. Parr* was reaffirmed and both the case law and the academic authorities dealing with equitable estoppel *vis-a-vis* a municipal corporation were thoroughly analyzed by Judge Finan in *City of Hagerstown v. Long Meadow*, 264 Md. 481, 489–496, 287 A.2d 242 (1972). The plaintiff shopping center had complained about the failure of the Hagerstown Board of Zoning Appeals to grant it a building permit to erect a motion picture theater. Relying upon the advice of a zoning official, who had told it that it was all right to proceed without a permit, the shopping center had already incurred significant demolition and construction expenses. Relying upon long-standing custom, the zoning official had "drafted and delivered to [the shopping center] a letter which stated that no permit would be required by the City." 264 Md. at 487, 287 A.2d 242. Though an honest mistake, that was not the actual state of the law. The circuit court ultimately ruled that the Board of Zoning Appeals was equitably estopped from denying the permit. The Court of Appeals reversed the circuit court and held that equitable estoppel did not bar the municipal officials from enforcing the letter of the law notwithstanding "the hardship which will evolve on Long Meadow" and the "apparent harshness of this ruling." 264 Md. at 496, 287 A.2d 242.

Relying upon the ruling of the circuit court in its favor, as UPS here relied upon the ruling of the County Board of Appeals in its favor, the shopping center had continued with construction even though litigation was still in progress. Judge Finan observed that this "ameliorated" the otherwise apparent harshness of the decision:

"[T]he major portion of expense incurred by Long Meadow was the result of the construction which it undertook

while the decision of the lower court was pending review on appeal. Thus, in a way, Long Meadow embarked on a calculated risk."

264 Md. at 496, 287 A.2d 242.

The excellent discussion of Judge McAuliffe in *Permanent Financial Corp. v. Montgomery County*, 308 Md. 239, 247–253, 518 A.2d 123 (1986), is completely compatible with this body of case law. In that case, to be sure, involving not a land use but a height restriction, the Court of Appeals did hold, following the issuance of a building permit containing an erroneous height limit, that "Permanent having expended substantial funds in reliance upon the permit, it would be inequitable to now permit the County to require the removal of the fourth floor." 308 Md. at 252–253, 518 A.2d 123.

*Berwyn Heights v. Rogers*, 228 Md. 271, 179 A.2d 712 (1962), closely parallels the case at bar. In that case, construction "was begun only after appellee had received building permits from both the appellant's and the county's building inspectors, and construction was in conformity with said permits." 228 Md. at 273–274, 179 A.2d 712. The Town of Berwyn Heights, however, ultimately "concluded that a mistake had been made in the issuance of said permits, and placed a stop work order on further construction." *Id.* at 274, 179 A.2d 712. The circuit court ruled in favor of the defendant Rogers. In reversing the circuit court, the Court of Appeals rejected the defendant's claim that the municipality was equitably estopped from proceeding against him. It held, 228 Md. at 279–280, 179 A.2d 712:

"Finally, the appellee claims, without the citation of authority, that the appellant is estopped from prosecuting the suit by the fact that it and the county issued him building permits, and he has expended substantial amounts of money in partially constructing the dwelling. Some authorities hold that the principle of estoppel does not apply against a city, but the majority rule is to the effect that the doctrine of estoppel in pais is applied to

municipal, as well as to private, corporations and individuals, at least where the acts of its officers are within the scope of their authority and justice and right require that the public be estopped. And it has been held that municipalities may be estopped by reason of the issuance of permits. However, the cases and text-writers very generally state that a municipality is not estopped to set up the illegality of a permit. And the issuance of an illegal permit creates no 'vested rights' in the permittee. *We have held above that the permits issued to the appellee were in violation of the zoning ordinance; consequently they were unlawful and did not estop the appellant from prosecuting this suit."* (citations omitted) (emphasis supplied).

The Court of Appeals further observed, however, that the defendant was not necessarily without ultimate redress. The proper avenue for seeking such redress, however, was a request for a special exception:

"[A]s the permits were issued and appellee has made substantial improvements as a result thereof, no final injunction should issue at this time. We will, therefore, remand the case for further proceedings without prejudice to the appellee to make application, within a reasonable time to be set by the chancellor, to the proper zoning authorities for possible relief by way of a special exception, variance or otherwise."

228 Md. at 280, 179 A.2d 712. That was precisely the possible redress suggested by Judge Murphy here:

"Under Maryland law, equitable estoppel permits UPS to operate the center until the Zoning Commissioner determines whether a special exception should issue and may ultimately entitle UPS to a special exception. This doctrine cannot, however, convert a use permitted by special exception only into a use permitted as a matter of right. The Zoning Commissioner must determine whether UPS is entitled to a special exception. This case is therefore

remanded with directions so that the essential administrative action will finally get underway."

We concur.

UPS's final contention is that the County Board of Appeals was without jurisdiction to entertain the appeal in the first instance and that Judge Murphy, therefore, was in error in not dismissing Mr. Hupfer's appeal to the circuit court on that ground. The Board of Appeals had decided that it had jurisdiction to hear the case. Judge Murphy agreed. We affirm his ruling in that regard.

The issue of the Board's jurisdiction has a substantive and a procedural aspect. We consider first the substantive aspect.

Md.Code, art. 25A, § 5(U)—part of the Express Powers Act—authorizes chartered counties, such as Baltimore County, to enact local laws providing for a board of appeals and empowering it, "on petition by any interested person," to render a decision on "such of the following matters arising (either originally *or on review of the action of an administrative officer* or agency) under any law, ordinance, or regulation of ... the issuance ... of any license, permit, *approval ... or other form of permission ...*" (emphasis added). Sections 601 and 602 of the County Charter implement that authority. Section 601 creates the Board of Appeals. Section 602 empowers the Board to exercise "all the functions and duties relating to zoning described in Article 25A of the Annotated Code of Maryland, as such functions and powers may be prescribed by legislative act of the County Council." It also directs the Board to hear and decide "all appeals from orders relating to building" and "appeals *from all other administrative and adjudicatory orders* as may from time to time be provided by Article 25A ... or by legislative act of the county council not inconsistent therewith." (emphasis added). The County Council has further implemented these provisions by enacting § 26–132 of the County Code, giving "[a]ny person ... aggrieved or feeling aggrieved by *any*

*decision* of the zoning [administrator] ... the right to appeal therefrom to the county board of appeals." (emphasis added).

There can surely be no doubt that, by virtue of these State Code, county charter, and county code provisions, the Board of Appeals has substantive jurisdiction to review a final administrative or adjudicatory determination by the Zoning Administrator, whether or not expressed in the form of an order, that a proposed project either does or does not require a special exception. *Cf. Harford County v. Preston,* 322 Md. 493, 588 A.2d 772 (1991).

We have concluded, as did Judge Murphy, that the UPS facility constitutes a trucking facility and therefore requires a special exception. UPS and the county government were sufficiently concerned about the possibility of such a determination as to request, and receive, a "sign-off" from the Zoning Administrator. There is nothing wrong, of course, about such a procedure; indeed, given the scope and cost of the project, it was a prudent thing to do. The one problem with that approach, however, is that it is entirely private: the public has no notice of the request or of the determination and therefore no ability to challenge the information, the assumptions, or the argument being made to the Zoning Administrator by the proponent.

■ Certainly, any decision made by the Zoning Administrator through such a private process carries with it a risk to the proponent who acts upon it. The Administrator is not empowered to change or ignore the county zoning law, and if his conclusion that the proposed use is permitted as of right is incorrect, there must be the ability on the part of interested and aggrieved persons to challenge it when the error is discovered. The law does not, as UPS would have it, allow administrative error made in private to be encrusted with impregnable armor merely by the lapse of time.

■ The county zoning law, in fact, sets forth certain procedures to be followed in cases such as this.

Section 500.5 of the zoning law requires notice and a public hearing on any petition for special exception. By obtaining the private "sign-off," of course, UPS avoided the need to file such a petition and thereby avoided as well the notice and hearing. Rule III adopted by the Zoning Administrator [1] expressly permits any person to file with the Administrator a zoning complaint alleging a violation of the county zoning law. That right, of course, transcends the Rule. Indeed, § 500.7 of the county zoning law gives the right to "any interested person to petition the Zoning [Administrator] for a public hearing after advertisement and notice to determine ... any rights whatsoever of such person in any property in Baltimore County insofar as they are affected by these Regulations."

Section 500.6 of the county zoning law authorizes the Zoning Administrator, "upon notice to the parties in interest, to conduct hearings involving any violation or alleged violation or noncompliance with any zoning regulations, *or the proper interpretation thereof,* and to pass his Order thereon, subject to the right of appeal to the [Board of Appeals] as hereinafter provided." (emphasis added). Section 500.7 which, as noted, authorizes any interested person to petition for a hearing provides further that, upon receipt of such a petition, the Zoning Administrator "shall schedule a public hearing for a date not less than 30 days after the petition is accepted for filing."

Mr. Hupfer's letter of January 11, 1987, to the Zoning Administrator was not, of course, a petition for a public hearing. But it clearly was a notice or complaint of a zoning violation. It described the property and the precise nature of the alleged violation and raised the issue of noncompliance with the zoning regulations "or the proper interpretation thereof." Moreover, it was treated by the

---

1. It should be noted that whereas the Baltimore County zoning regulations use the term "Zoning Commissioner," the Baltimore County Code uses the term "Zoning Administrator." We use the terms interchangeably.

Administrator as such but simply rejected based on the Administrator's conclusion that the use was permitted as of right and did not require a special exception. His response of January 19, 1987 to Mr. Hupfer could not be more certain in that regard: "I am more convinced than ever that the UPS is a warehouse operation and does not require a special exception." On that basis, he made clear that he intended to take no further action.

That response constitutes an "action of an administrative officer" relating to an "approval ... or other form of permission" under Art. 25A, § 5(U). It amounts to a "decision" of the Zoning Administrator for purposes of County Code, § 26.132. It therefore was appealable to the Board of Appeals, and, as the appeal to that Board was filed on February 8, 1987—within 30 days—the Board had jurisdiction to consider it.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.*

CATHELL, Judge, dissenting.

In this case, I respectfully suggest that the majority has attempted to make any comment, belated statement, or subsequent response by a zoning administrator in relation to the prior issuance of a building permit an appealable event. An event which, given the process the majority adopts, revives the appeal period with respect to the issuance of the permit itself. As I see it, and as I believe the law has generally perceived it, an administrative appeal period commences to run from the time of the issuance or denial of a building permit. Once the appeal period has passed, administrative finality occurs. At that point, insofar as the administrative process is concerned, the permit issued is administratively valid,[1] and, if denied, is administratively conclusive. In other words, the issue is administratively dead.

---

1. Administrative finality would not foreclose the subsequent filing of equitable actions.

What the majority has done is adopt a rule of resurrection or resuscitation which, I submit, effectively destroys any concept of administrative finality and furnishes to anti-developmental interests in this State a weapon that can be used to reopen and relitigate any issues relating to development. Though the majority does not *now* explicitly state that actual notice and public hearings are necessary before the issuance of a building permit in order for administrative finality to attach to its issuance (after the appropriate appeal period), that is the practical effect of its decision.

In the case *sub judice*, after the appeal period had expired from the actual issuance of the permit, Mr. Hupfer informed the Zoning Administrator that he believed that a special exception was needed to operate the facility being constructed. The Zoning Administrator responded, in essence, that he stood by his original decision. "I am more convinced *than ever....*" (Emphasis added.) It is absolutely clear to me that the Zoning Administrator merely reaffirmed his original decision. The majority, however it couches its language, in essence holds that the time to appeal the issuance of a building permit commences when a Zoning Administrator responds to an objection to its issuance, rather than from its issuance. If Mr. Hupfer had delayed making his complaint for six months, six years or sixty years, under the majority holding the time to appeal the building permit could still be revived.

Under the circumstances of this case, appellees' remedy, as I perceive it, was to institute an action attempting to restrain the construction. In such an action, all defenses, including equitable defenses—laches, waiver, estoppel, etc.—could be more fully explored.[2] Under the majority's holding, there can never be administrative finality with regard to the issuance of the hundreds of thousands, if not millions, of permits issued over the years.

---

**2.** I am unaware of any case in which the appellate courts of Maryland have recognized that a complete range of equitable defenses are available in the administrative appeal process.

One of the cases relied on by the majority in support of its decision is *Harford County v. Preston*, 322 Md. 493, 588 A.2d 772 (1991). It involved a *timely appeal* from the denial of a special exception and was ultimately remanded for the agency to make sufficient findings of fact. It was primarily a *Schultz v. Pritts* case.[3] *Preston* is cited in the case at bar for the proposition that a Board of Appeals has "substantive jurisdiction to review a final administrative or adjudicatory determination by the Zoning Administrator...." Though I fail to find that holding in *Preston*,[4] I agree that it correctly states the law. I disagree that every time an administrator reiterates his or her original decision that the prior decision becomes interlocutory and the reiteration of the original decision becomes the new *final* determination—*ad infinitum*. That is the logical result of the majority holding.

Four other cases cited by the majority for the holding it espouses are: *Permanent Fin. Corp. v. Montgomery County*, 308 Md. 239, 518 A.2d 123 (1986); *City of Hagerstown v. Long Meadow Shopping Center*, 264 Md. 481, 287 A.2d 242 (1972); *Berwyn Heights v. Rogers*, 228 Md. 271, 179 A.2d 712 (1962) and *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933). These cases were actually offered earlier in the majority opinion to support the general position that permits can be rescinded. I take no issue with that part of the majority's opinion so long as it is a proper case in an appropriate proceeding. The instant case, I submit is neither proper nor appropriate. The majority offers no case law to support that portion of its opinion to which I dissent.

*Lipsitz* and *Berwyn Heights* were both equitable actions. *Lipsitz* was brought to restrain governmental officials from

---

3. 291 Md. 1, 11–12, 432 A.2d 1319 (1981). As relevant in *Preston*, *Schultz* requires an agency to determine whether adverse impact is sufficiently site selective so as to justify a denial of a special exception given the presumption that special exceptions are generally compatible with the district in which they are permitted.

4. The court presumed "without deciding" that the county had certain powers.

interfering with an issued permit, and *Berwyn Heights* to enjoin the construction of a dwelling. In the instant case, the appellees chose not to file an action for equitable restraints but, by raising a subsequent administrative complaint, attempted to appeal a prior routine zoning interpretation that had resulted in the issuance of a building permit. Both *City of Hagerstown* and *Permanent Financial* involved timely appeals by applicants from the *denial* of building permits, not *untimely* appeals by non-parties from the *issuance* of a building permit.[5] *Lipsitz, Berwyn Heights, City of Hagerstown,* and *Permanent Financial* are examples of how issues such as those in the case at bar are traditionally resolved. Rather than supporting the procedural posture taken by the majority, they are examples of how these issues should be raised, and, I respectfully suggest, offer no support for the majority's position.

The majority's position indicates an indifference to which administrative event is the appealable event. Under the majority's holding, the time of the issuance of a permit is immaterial. The issuance of the permit is never final for appeal purposes so long as any person thereafter chooses to complain about the zoning interpretation that supports the permit's issuance. Under the reasoning given, the time for appeal does not start to run as to any party who might be interested until he or she writes a letter asking what has happened and receives a reply. In the present case, it was at least two to three months after the commencement of construction and the issuance of the permit. Had Mr. Hupfer wintered in Florida, it could have easily been several months. If he was in the military service stationed overseas, it could have been years. The scenarios are infinite.

With the decision of the majority on this point, I fear that great economic damage will result, not only to UPS (which

---

5. The majority has not directed our attention to any cases involving an appeal by a non-applicant from the routine issuance to another of a building permit.

may or may not deserve it) but in a general sense as well. Construction lenders, permanent financial entities, title insurance companies, and the like can never be protected by the finality of the administrative process. The issuance of the building permits and sometimes the termination of the period of appeal dating from their issuance start the flow of financing that fuels the developmental industry. The land acquisition funding, the first and subsequent construction draws, the ultimate permanent financing—all rely on the issuance of the permit and the appeal period arising therefrom.

It is important to note that the case *sub judice* did not, originally, at the administrative level, involve an application for a variance, change of zoning, conditional use, special exception, change of zoning maps, comprehensive rezoning or the like—areas that traditionally require notice and public hearings. Appellant simply applied for and received a building permit. If, as the majority suggests, the issuance of a building permit requires actual notice—to whom? If, in order to insure administrative finality, every building permit must first be subject to a public hearing, where are the tens of thousands of hearings to be held? If notices and hearings are required prior to the mere issuance of a permit, why differentiate in zoning codes between permitted uses and other uses? If an interpretation of a zoning administrator is not final until the last person to know of it knows of it, how can it ever be final?

The majority finds it troublesome that the process UPS followed to obtain a determination from the administrator that no special exception was required "is entirely private." What I presume the majority to mean is that it was not done at a public hearing. The record reflects that the approach taken by UPS is virtually the same as that taken by every applicant. There is no indication in the record that it was done behind closed doors or that the records of the approval were in any way concealed. As far as the record before us is concerned, all evidence of contacts between UPS and the zoning office were at all times part of the

public zoning records of Baltimore County, fully available for review at any time by any member of the public—including Mr. Hupfer. In this case, as in virtually every case of zoning sign-offs, the record was available to the public. It was not kept private. In an administrative context, there was no more of a requirement in this case for public notice than in any other application for a building permit. If public notice and/or public hearings were required in this case in respect to the administrator's original interpretation that the use was permitted, then public notice and hearings are required in every case.

The majority also states: "The administrator is not empowered to change ... the county zoning law, and if his conclusion ... is incorrect, there must be the ability ... of ... aggrieved persons to challenge it when ... discovered." I agree. Equity is already available. To reopen the administrative process is to create a new remedy—one never before used.[6] I suggest that, absent clear and unambiguous legislative direction, or direction from the Court of Appeals, the creation of a new remedy is as unwise as it is unnecessary, especially considering the basic proposition that zoning is a deprivation of or interference with otherwise protected common-law property rights.[7]

---

6. The provisions of the Baltimore County Code are not unique. They are contained in many zoning codes. The majority directs us to no cases employing the remedy it adopts. I have found none.

7. The Court of Appeals in *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 313–14, 289 A.2d 303 (1972), when discussing the balancing of the rights of the property owner versus the public welfare, quoting from *Landay v. Board of Zoning Appeals*, 173 Md. 460, 466, 196 A. 293 (1938), said:

> Such ordinances [zoning ordinances] are in derogation of the common law right to so use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, they should not be extended *by implication* to cases *not clearly* within the scope of the purpose and intent manifest in their language. [Emphasis added, brackets in original, citation omitted.]

*See also County Comm'rs v. Zent*, 86 Md.App. 745, 751, 587 A.2d 1205 (1991).

I conclude by suggesting that appellees here should be left to their equitable remedies, if any now remain. To answer appellees' complaint by expanding the concept of appealability and destroying the concept of administrative finality as the majority has done is, I believe, fraught with great potential for economic mischief. More importantly, it is, I believe, wrong.