518 A.2d 123
**PERMANENT FINANCIAL CORPORATION, Trustee**

v.

**MONTGOMERY COUNTY, Maryland et al.**

**No. 69, Sept. Term, 1985.**

Court of Appeals of Maryland.

Dec. 5, 1986.

Joseph P. Blocker and Larry A. Gordon (Linowes & Blocher, on brief), Silver Spring, for appellant.

Clyde C. Henning, Asst. Co. Atty. (Paul A. McGuckian, Co. Atty. and Alan M. Wright, Sr. Asst. Co. Atty., on brief), Rockville, for Montgomery County, Md., part of appellees.

Nancy M. Floreen, Silver Spring (David O. Stewart and Miller, Cassidy, Larroca & Lewin, on brief), Washington, D.C. for the et al. part of the appellees.

Arthur S. Drea, Jr., Kenneth P. Barnhart, Silver Spring, for The Maryland-National Capital Park and Planning Com'n, other appellees.

Argued before MURPHY, C.J., and SMITH,* EL-DRIDGE, COLE, RODOWSKY, COUCH, and McAULIFFE, JJ.

McAULIFFE, Judge.

Pursuant to the authority of a building permit issued by Montgomery County, a developer undertook construction of an office building in Silver Spring, Maryland. Eight and one-half months and more than two million dollars later, when the shell of the building was complete, the County suspended the building permit and issued a stop work order on the grounds that the building violated statutory height

---

* Smith, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

limitations, set-back requirements, and floor area ratio restrictions. The developer appealed to the Montgomery County Board of Appeals ("the Board") and concurrently filed with that body an application for variances to exempt the building from any requirements of the Zoning Code with which it might not comply. The Board denied relief from the suspension and stop work order and refused to grant any variance. The Circuit Court for Montgomery County affirmed, and that action was affirmed by the Court of Special Appeals in an unreported *per curiam* opinion. We granted certiorari principally to consider the developer's contention that the doctrine of equitable estoppel should be applied against the County. We conclude the County is estopped from contending that the fourth floor of the building violates the height limitations of the Montgomery County Code. We further conclude, however, that the building as constructed is otherwise in violation of the code and that the Board did not err in refusing to set aside the suspension and stop work order or in refusing to grant the requested variances.

Permanent Financial Corporation ("Permanent"), as trustee for others, began the development of this commercial office building by obtaining a building permit from the Montgomery County Department of Environmental Protection (DEP) on January 11, 1982. Six months later Permanent obtained a revision of the permit by which DEP approved an increase in the size of the first floor. The building as erected is on a rectangular lot that comprises an area of 18,750 square feet and has no unusual topographical features. The land is zoned CBD-1, which is a central business district zone intended for use in areas where high densities are not appropriate. Montgomery County Code (1972, 1977 Repl.Vol.) § 59-C-6.211(b).[1] The building contains four floors of above ground office space and a "penthouse" or fifth floor designed primarily to house mechanical

---

1. Hereinafter all code references are to the Montgomery County Code unless otherwise indicated.

equipment. Each of the second, third, and fourth floors is larger than the floor beneath it, giving the building a trapezoidal shape.

### The Height Limitation

■ The height limitation for a building erected in the CBD–1 zone under the method of development utilized here is established by § 59–C–6.235. Ordinarily, the maximum permissible building height is 60 feet. However, where the property adjoins or is directly across the street from certain residential zones, as is the case here, the maximum building height is "35 [feet] plus an additional 8 feet for nonhabitable structures." Section 59–A–2.1 specifies how the height of a building is to be determined:

> The vertical distance measured from the level of approved street grade opposite the middle of the front of a building to the highest point of roof surface of a flat roof; to the deck line of a mansard floor; and to the mean height level between eaves and ridge of a gable, hip or gambrel roof; except, that if a building is located on a terrace, the height above the street grade may be increased by the height of the terrace. . . .

Permanent appears to have abandoned its earlier claim that the building is located on a terrace. In any event, the evidence was sufficient to support the Board's finding that the building is not, and that the beginning point of the measurement is the level of the approved street grade opposite the middle of the front of the building. Using that point of reference, the building measures 43 feet to the top of the fourth floor and 53 feet to the highest point of the roof of the penthouse.

Permanent persists in its claim that the penthouse has a mansard roof, and that the measurement must therefore be made to "the deck line of [the] mansard floor" which Permanent says is coincident with the roof of the fourth floor. We need not consider Permanent's strained interpretation of what constitutes the deck line of a mansard floor, because the record fully supports the finding of the Board

that the penthouse does not have a mansard roof. The Montgomery County Zoning Code did not at the time define a mansard roof;[2] however, there was testimony that it is a roof having a double slope on all four sides, the lower slope usually being steeper. The gambrel roof often seen on barns exemplifies the double slope of a mansard roof—the difference being that the gambrel roof has two gable ends as opposed to the double slope configuration of all sides of a mansard roof.

The testimony and exhibits within this record show the penthouse roof as essentially flat, and having a parapet similar to the one on the flat roof of the fourth floor. Any slope that the penthouse roof does have is negative, and appears no greater than might be desired for drainage. Although the four walls of the penthouse have a positive slope, it requires at the very least a creative imagination to envision them as the lower slopes of a roof. The Board was not clearly wrong in finding that this penthouse does not have a mansard roof. *Board of Educ., Mont. County v. Paynter*, 303 Md. 22, 491 A.2d 1186 (1985); *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 490 A.2d 1296 (1985).

Permanent next contends that even if the measurements show the height of the building to be 53 feet to the top of the penthouse and 43 feet to the top of the fourth floor, there is no violation of the code. Concerning the penthouse, Permanent argues that as a roof structure housing mechanical equipment incident to the use of the building, the penthouse is exempt from height controls. Concerning the fourth floor, Permanent argues that the code permits 35 feet plus 8 feet for nonhabitable structures, and that because the fourth floor will be used for offices rather than

---

2. Section 59–A–2 was amended March 4, 1986, to provide a definition of a mansard roof, and to further provide that the measurement of height is to be made to the mean height level between the eaves and ridge of a mansard roof.

living space it is "nonhabitable" within the meaning of the code. We shall examine the contentions separately.

 The exemptions from height control existing at the time of the issuance of the building permit in this case were contained in § 59–B–1.1 as follows:

> The building height limits set forth in this chapter shall not apply to belfries, chimneys, cupolas, domes, flagpoles, flues, monuments, radio towers, television antennae or aerials, spires, tanks, water towers, water tanks, air conditioning units or similar roof structures and mechanical appurtenances, except where such structures are located within an airport approach area, as designated on the zoning map. No such roof structure, however, shall have a total area greater than twenty-five percent of the roof area; nor shall such structure be used for any purpose other than a use incidental to the main use of the building.

The penthouse fails to qualify for an exemption in at least two respects. First, the plans show an office in the penthouse for janitorial or security personnel, and an office is not an exempt roof structure. Second, the penthouse occupies forty-six percent of the roof area, nearly double the twenty-five percent coverage permitted by the code.[3] The penthouse, as built, does not conform with the requirements of the code.

 The problem presented by the fourth floor is entirely different. As we have noted, § 59–C–6.235 permits a height of 35 feet "plus an additional 8 feet for nonhabitable structures." Permanent views "nonhabitable structures" as the converse of "habitable space," and draws its defini-

---

**3.** Permanent suggests that its penthouse structure might lawfully occupy up to thirty-three and one-third percent of the roof area, and in support of this argument it cites the definition section of the BOCA Basic Building Code. While this issue is not directly before us, inasmuch as the penthouse as built clearly exceeds even that percentage, we observe that the general definition of a penthouse contained in the BOCA Basic Building Code has no direct applicability to the Zoning Code. See text, infra.

tion of the latter from § 201.0 of the BOCA Basic Building Code, 1981:

> *Habitable space:* Space in a structure for living, sleeping, eating, or cooking. Bathrooms, toilet compartments, closets, halls, storage or utility spaces and similar areas are not considered habitable space.

The BOCA Basic Building Code has been adopted by Montgomery County as its Building Code, Montgomery County Code (1972, 1977 Repl.Vol.) § 8–14, and definitions contained in the BOCA Code therefore apply in the interpretation of the Montgomery County Building code. This does not mean, as Permanent suggests, that the BOCA Code definitions apply to every other portion of the Montgomery County Code. While the officials of DEP might reasonably be expected to look to a definition contained in other sections of the code for guidance, that definition is not binding.

Appellees, on the other hand, contend that the term "nonhabitable structures" is intended to include only space occupied by water towers, water tanks, air conditioning units or similar mechanical appurtenances,[4] and that office space cannot properly be considered "nonhabitable."

The record before the Board discloses that the County had consistently applied the interpretation urged by Permanent, and had uniformly permitted a height of 43 feet for office buildings in these circumstances. It further discloses, however, that the Montgomery County Planning Board of the Maryland National Capital Park and Planning Commission held quite a different view. The Board of Appeals concluded that the definition urged by Appellees and the Planning Board was correct, and determined the maximum permitted height of this building to be 35 feet. Abandoning its long standing prior position, the County

---

4. Section 59–C–6.235 was amended in 1984 to provide that the additional 8 feet was "for air conditioners or similar rooftop structures and mechanical appurtenances...."

now adopts the Board's interpretation as the correct one, and has amended its code accordingly.[5]

We will not disturb the Board's determination of the correct meaning of "nonhabitable structures" as that term is used in § 59–C–6.235. We do not, however, agree with the Board's observation that the section is "quite clear and unambiguous." The ambiguity *vel non* of the section is an important consideration in assessing the validity of Permanent's claim of equitable estoppel, to which we now turn.

As we pointed out in *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 62, 300 A.2d 367 (1973), we have adopted and continually applied the definition of equitable estoppel set forth at 3 J. Pomeroy, *Equity Jurisprudence*, § 804 (5th ed., 1941), as follows:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

In *Fitch v. Double "U" Sales Corp.*, 212 Md. 324, 339, 129 A.2d 93 (1957), we said:

> Equitable estoppel operates to prevent a party from asserting his rights under a general technical rule of law, when that party has so conducted himself that it would be contrary to equity and good conscience to allow him to do so.

There is no settled rule in this country as to when, and under what circumstances, equitable estoppel is available against a municipal corporation. More than a century ago, in *Rogers v. Burlington*, 70 U.S. (3 Wall) 654, 18 L.Ed. 79 (1865), the United States Supreme Court approved the appli-

---

**5.** *Id.*

cation of an equitable estoppel against the city of Burlington, Iowa. In that case, for the purpose of making a loan in aid of development to the Burlington and Missouri River Railroad Company, the city issued bonds having a face amount of $75,000 which provided for payment of ten percent per annum interest, and payment of the principal amount after twenty years. Instead of selling the bonds and making a loan of the proceeds to the railroad company, the city elected to issue the bonds to the railroad company for it to sell, and took first mortgage bonds of the company as collateral. Thereafter, when the city refused payment of interest to Rogers, a bona fide purchaser of some of the bonds, he brought suit. The city demurred, claiming it was without authority to issue the bonds, and the issuance was void because it was not for any municipal purpose. Finding against the city, Mr. Justice Clifford said for the Supreme Court:

> [T]he rule that a corporation quite as much as an individual is held to fair dealing with other parties, applies with all its force, and we repeat, that corporations cannot by their acts, representations, or silence, involve others in onerous engagements, and be permitted to defeat the calculations and claims which their own conduct has superinduced.

*Id.* at 667.

A collection of cases dealing with the applicability of the doctrine of estoppel against a municipal corporation may be found at 9A McQuillin, *Municipal Corporations* § 27.56 (3rd ed. rev.), where it is stated:

> Although there is authority to the effect that the doctrine of estoppel does not apply as against a city, many decisions have held that the doctrine may be applied to municipal, as well as to private, corporations and citizens, when appropriate circumstances, justice and right so require. The assertion of the doctrine in proceedings to enjoin the violation or the enforcement of municipal ordinances ... is common. However, mere nonaction of municipal officers is not enough to establish an estoppel;

there must have been some positive acts by such officers that have induced the action of the adverse party. It must appear, moreover, that the party asserting the doctrine incurred a substantial change of position or made extensive expenditures in reliance on the act.

*See also* 9A *McQuillin, supra,* §§ 26.213 and 26.214. For a more activist position, as well as criticism of this Court and of other courts for imposing certain restrictions upon the use of equitable estoppel against municipal corporations, *see* 2 Antieau, *Municipal Corporation Law* ch. 16A (1986).

Although our predecessors said in *Gaver v. Frederick Cty.,* 175 Md. 639, 649, 3 A.2d 463 (1939), that "[t]here is nothing in the nature of a municipal corporation to exempt it from the application of the doctrine of estoppel as it would apply to a natural person or a business corporation," in practice we have applied the doctrine more narrowly. *See City of Hagerstown v. Long Meadow,* 264 Md. 481, 287 A.2d 242 (1972); *Kent County v. Abel,* 246 Md. 395, 228 A.2d 247 (1967); *Berwyn Heights v. Rogers,* 228 Md. 271, 179 A.2d 712 (1962); *Lipsitz v. Parr,* 164 Md. 222, 164 A. 743 (1933). Judge Prescott summarized the principles of law applicable to this type of case in *Berwyn Heights v. Rogers, supra,* 228 Md. at 279–80, 179 A.2d 712:

> Some authorities hold that the principle of estoppel does not apply against a city, but the majority rule is to the effect that the doctrine of estoppel in pais is applied to municipal, as well as to private, corporations and individuals at least where the acts of its officers are within the scope of their authority and justice and right require that the public be estopped.... And it has been held that municipalities may be estopped by reason of the issuance of permits.... However, the cases and text writers very generally state that a municipality is not estopped to set up the illegality of a permit.... And the issuance of an illegal permit creates no "vested rights" in the permittee.... (citations omitted).

In discussing the spectrum of problems that may arise from the revocation of a permit, Judge Weintraub, speaking for

250

the Superior Court of New Jersey in *Jantausch v. Borough of Verona*, 41 N.J. Super. 89, 124 A.2d 14, 16–17 (1956), *aff'd*, 24 N.J. 326, 131 A.2d 881 (1957), said:

> Our cases clearly settle the controlling principles at the extreme poles of the problem. Where the permit is regularly issued in accordance with the ordinance, it may not be revoked after reliance unless there be fraud.... On the other hand, where there is no semblance of compliance with or authorization in the ordinance, the deficiency is deemed jurisdictional and reliance will not bar even a collateral attack....
>
> But what of the intermediate situation in which the administrative official in good faith and within the ambit of his duty makes an erroneous and debatable interpretation of the ordinance and the property owner in like good faith relies thereon?

Although the New Jersey appellate courts did not find it necessary in *Jantausch* to answer the question thus posed, it was later answered in *Jesse A. Howland & Sons v. Borough of Freehold*, 143 N.J. Super. 484, 363 A.2d 913, 916, *cert. denied*, 72 N.J. 466, 371 A.2d 70 (1976). There the Superior Court of New Jersey, Appellate Division, held that estoppel would apply in the circumstances described by Judge Weintraub, provided one further condition were met:

> The requirement we would add ... is the necessity for the appearance of an issue of construction of the zoning ordinance or statute, which, although ultimately not too debatable, yet was, when the permit was issued, sufficiently substantial to render doubtful a charge that the administrative official acted *without any reasonable basis* or that the owner proceeded without good faith. (emphasis in original).

The development of Maryland law has proceeded along similar lines. We said in *Lipsitz v. Parr, supra*, 164 Md. at 227, 164 A. 743, that "[a] municipality may be estopped by the act of its officers if done within the scope and in the course of their authority or employment, but estoppel does not arise should the act be in violation of law." Acknowl-

edging the potential application of the doctrine of estoppel to the "intermediate situation" described by Justice Weintraub, we said in *City of Hagerstown v. Long Meadow,* 264 Md. at 493, 287 A.2d 242:

Nor do we think the facts of this case permit the successful use of the argument that the Building Inspector was following a long standing administrative interpretation when he informed Callas and Long Meadow that no building permit was required. This rule, when applicable, must be bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance, which latter element is not here present.

In the case before us, we conclude that the definition of "nonhabitable structures" within the meaning of § 59–C–6.-235 was open to at least two reasonable and debatable interpretations. We further conclude that the County shared the interpretation given this section by Permanent at the time of the issuance of the building permit, and that the County had consistently applied that interpretation for a significant period of time prior thereto. Indeed, it is apparent that the County persisted in that interpretation well into the hearing of this case by the Board, becoming convinced of the validity of a contrary interpretation only after considering the testimony of the chairman of the Planning Commission or perhaps the decision of the Board. Illustrative of this persistence is the fact that the County's stop work order stated that the building exceeded "the maximum height of 43 feet." Additionally, in response to Permanent's request for specifics, the County wrote that the building's measured height of 53 feet exceeded the maximum allowable height of 43 feet. In a later letter supplementing the reasons for the stop work order, the County included allegations of violation of required building setbacks, but again failed to suggest that the building through its fourth floor violated any height restrictions. Finally, at the initial hearing, the assistant county attorney informed the Board that the County's interpretation of "nonhabitable

structures" varied from that of the Planning Commission and interested neighbors:

> So in that context I think that it is very important to hear, and again, I am characterizing it as an opposing point of view but we are not putting on the gloves and fighting it out because it is the Department's position that both interpretations are reasonable ones. And it is good that this is a de novo type hearing because that is one question that you are going to have to answer.
>
> What is the proper interpretation of those words, and you can see, I do not know whether it is in their Motion to Intervene or in their Motion to Dismiss, the intervenors indicate that they have got a different interpretation and that we misapplied those words. And Mr. Barnhart is here from Park and Planning, I know, and he can state on the record, that Park and Planning feels the same way.

Permanent clearly relied upon the interpretation the County had given to the height limitation in its design of the building. In the initial application for a building permit, Permanent stated the height of the proposed building as "37 + 8." Appellees do not disagree that "37" was a typographical error, and that "35" was intended. Moreover, the measurement of the building as shown on the plans submitted with the application was 43 feet to the top of the fourth floor. We have no doubt that Permanent designed and built its building to a height of 43 feet through the fourth floor in reliance upon the long standing interpretation of the County, and that this interpretation, while subsequently found by the Board of Appeals to be incorrect, was nevertheless reasonable and debatable. Although the issue is somewhat clouded by the fact that the County should not have issued the building permit because of other deficiencies, it is at least clear that this portion of the decision to issue the permit was not the result of oversight by the County, but rather was consistent with its practice. This being the case, and Permanent having expended substantial funds in reliance upon the permit, it

would be inequitable to now permit the County to require the removal of the fourth floor.

### The Floor Area Ratio

■ The floor area ratio ("FAR") permitted by the Code for this building is 1.0, meaning that the gross floor area of the building must not exceed the area of the lot upon which it is built. In its application for a building permit, Permanent calculated the gross floor area as 18,700 square feet, which produced an acceptable FAR of .99. This calculation was apparently correct if the area of the penthouse was not included in the computation. In its revised plans submitted six months later, Permanent expanded the area of the first floor. The County now contends that it erroneously failed to include the area of the penthouse when it initially made the computation of gross floor area, and that the inclusion of the penthouse as well as the enlarged portion of the first floor now produces an unacceptable FAR of 1.26. Permanent does not contest the accuracy of the figures, but contends the penthouse need not be included in the computation of gross floor area for purposes of determining the FAR.

Section 59–A–2.1 defines "gross floor area" as follows:

The sum of the gross horizontal areas of the several floors of all buildings on the lot, measured from the exterior faces of exterior walls and from the center line of walls separating two buildings. The term gross floor area shall include basements, elevator shafts and stairwells at each story, floor space used for mechanical equipment (with structural headroom of six feet, six inches or more) penthouses, attic space (whether or not a floor has actually been laid, providing structural headroom of six feet, six inches or more), interior balconies and mezzanines. The term "gross floor area" shall not include cellars, outside balconies which do not exceed a projection of six feet beyond the exterior walls of the building, parking or rooftop mechanical structures.

We find no ambiguity in this definition, at least as applied to the penthouse that is currently constructed on Permanent's building. While "rooftop mechanical structures" are excluded from the computation, this exclusion obviously does not apply to rooftop mechanical structures enclosed within a penthouse or other enclosure having a structural headroom of six feet, six inches or more. The building exceeds the prescribed FAR, and the County is not estopped to require correction of that deficiency.

### *The Setback Requirement*

■ Before considering the substantive issues involved in this aspect of the case, we must deal with a threshold procedural question. Appellees contend the administrative appeal was taken only from the initial action of the County in suspending the permit and issuing a stop work order. They point out that this order referred only to violations of the height limitations and the FAR. Appellees acknowledge that later letters from the County to Permanent detailed the alleged setback violations as well, but they note the administrative appeal was taken before those letters were sent. The Board agreed that the question of setbacks was not before it in the administrative appeal, but it did consider Permanent's consolidated request for a variance from required setbacks.

Permanent's appeal was from the action of DEP in issuing a stop work order and suspending the building permit. That action was taken on May 4, 1983, and the appeal was timely filed on June 2, 1983. After the appeal was taken, DEP informed Permanent that it was also relying upon violations of setback requirements. At the initial hearing before the Board on June 22, 1983, the Board discussed with the parties the impact of § 59–G–3.1(e) which mandated a particular procedure when an administrative appeal challenged a calculation of building height or FAR. Because this section required that such appeals be considered according to the provisions governing appeals for a variance rather than according to those governing an administrative

appeal, and because as a part of that procedure the Board was required to request technical advice from the Planning Commission, the parties and the Board were unsure of how best to proceed. It was ultimately agreed that the County would give formal notice to Permanent of its intent to include alleged setback violations as a reason for its previous action, and that Permanent would file a separate application for variances which would then be consolidated with the administrative appeal. Appellees contend that it was also understood Permanent would file an additional administrative appeal from the notice of inclusion of setback violations, but this is not evident from the record.

Whatever may have been contemplated by the parties, the DEP did not issue a new stop work order containing reasons for its action. Rather, it wrote Permanent on June 23 advising of violation of building setbacks, and concluded by stating:

> These setback violations serve as a basis for this Department's prior suspension of the above referenced building permit. The "stop work order" was previously issued and continues to remain in effect as a necessary consequence of the suspension of the building permit.

The practical effect of the procedure employed by the parties was to permit the County to amend the reasons assigned for the actions taken on May 4. Permanent was not required to file a new administrative appeal in order to have the Board consider the alleged setback violations in connection with the stop work order and suspension of permit.

Ordinarily, we would direct that the case be remanded to the Board for initial consideration of the issue by that administrative agency. However, because the question of setbacks was before the Board in connection with Permanent's appeal for a variance, and was fully considered by the Board, we will consider it.

The substantive question is not complicated, and it must be resolved against Permanent. Section 59–C–6.236(b)(2)

requires a one foot setback from any right-of-way for every six feet of height by which a building exceeds 30 feet. The building as currently constructed is 53 feet high and requires setbacks from the right-of-way lines of three feet, ten inches. As currently constructed, a portion of the cellar wall and portions of the third and fourth floors violate these setback requirements along Wayne Avenue and Cedar Street. Elimination of the penthouse in the computation of the height of the building would have assisted Permanent with its setback problems, but for reasons previously stated the height of the building as now constructed must be computed to the roof of the penthouse.

### Laches

■ Permanent also attempts to set up the doctrine of laches as a bar to the enforcement of the code by the County. What we said about laches in *Lipsitz v. Parr, supra,* 164 Md. at 226–27, 164 A. 743, is apposite:

> Laches is an equitable defense. It is an inexcusable delay, without necessary reference to duration, in the assertion of a right.... Laches and estoppel possess elements in common, and difficulty is encountered in clearly stating the distinction, particularly as the courts have studiously avoided a general or inflexible definition of laches, in order to be free to apply its principles to the particular circumstances of the instant case....

> Unless mounting to the statutory period of limitations, whose application is not denied upon equitable considerations, mere delay is not sufficient to constitute laches, if the delay has not worked a disadvantage to another.

The record discloses that the County acted promptly when the violations were brought to its attention by neighboring property owners. The delay alleged is the eight and one-half months during which the building was under construction. The consequences of that delay form an integral part of our earlier consideration of the doctrine of equitable estoppel, and we see no separate ground for the application of laches in this case.

### Denial of Variances

After finding Permanent in violation of height, setback and FAR requirements, the Board denied Permanent's request for a variance from each of those requirements. Acknowledging that the county employees should have detected the errors in the plans, the Board found that Permanent was also the author of its own misfortune in failing to submit properly prepared plans. The Board also found that the code criterion for the grant of a variance had not been met. Section 59–G–3.1(a) provides that the Board of Appeals may grant petitions for variances on proof by a preponderance of the evidence that:

(a) By reason of exceptional narrowness, shallowness, shape, topographical conditions or other extraordinary situations or conditions peculiar to a specific parcel of property, the strict application of these regulations would result in peculiar or unusual practical difficulties to, or exceptional or undue hardship upon, the owner of such property;

(b) Such variance is the minimum reasonably necessary to overcome the aforesaid exceptional conditions;

(c) . . . .

(d) Such variance will not be detrimental to the use and enjoyment of adjoining or neighboring properties. . . .

The Board was not clearly in error when it concluded that Permanent had failed to prove those matters legislatively determined to be appropriate conditions for the issuance of a variance.

### Conclusion

For the reasons we have outlined, the County is estopped to prevent construction of this building to a height of 43 feet. If the penthouse is modified to fit within the exemptions from height controls, Permanent will have satisfied the height restrictions of the ordinance. However, because the building currently violates height, setback and FAR

restrictions, the building permit was properly suspended and the stop work order properly issued.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY MONTGOMERY COUNTY, MARYLAND.