817 A.2d 938

**ANNE ARUNDEL COUNTY, Maryland**

v.

**Allen MUIR.**

**No. 524, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Feb. 28, 2003.

---

618

William D. Evans, Jr., Senior Assistant County Attorney (Linda M. Schuett, County Attorney on the brief), Annapolis, MD, for appellant.

Carla M. Siegel (Zwerdling, Paul, Leibig, Kahn & Wolly, P.C., on the brief), Alexandria, VA., for appellee.

Argued before DEBORAH S. EYLER, KRAUSER, CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In an action for judicial review, the Circuit Court for Anne Arundel County reversed a decision by the Board of Appeals ("Board") of the appellant, Anne Arundel County ("County"), that the appellee, Allen Muir, a police officer with the Anne Arundel County Police Department, is not entitled to credit toward his pension for his prior service with the Baltimore City Police Department.

We have reformulated the questions raised by the County as follows:

1. Did the circuit court incorrectly interpret Md.Code (1983 Repl.Vol., 1990 Supp.) sections 31 and 32 of former article 73B, as amended in 1990 by House Bill 687?

2. Is the County estopped to deny the transfer of service credit it effected for Officer Muir in 1992? [1]

---

1. The four questions presented by the County are:

  I.  DID THE CIRCUIT COURT FAIL TO PROPERLY CONSTRUE HOUSE BILL 687?

  II.  DOES THE COUNTY PERSONNEL OFFICER HAVE A FIDU-CIARY DUTY UNDER MARYLAND LAW TO CORRECT CLER-ICAL ERRORS IN PENSION CALCULATIONS?

For the following reasons, we shall reverse the judgment of the circuit court, and remand the case with instructions to affirm the decision of the Board.

## FACTS AND PROCEEDINGS

From November 22, 1974, to April 26, 1979, Officer Muir was employed as a police officer by the Baltimore City Police Department ("BCPD"). He left that employment and immediately went to work for The Westinghouse Corporation as a security guard. His employment at Westinghouse ended on July 17, 1980. The next day, July 18, 1980, Officer Muir began employment as a police officer with the Anne Arundel County Police Department ("AACPD").

During his employment by the BCPD, Officer Muir contributed to the Baltimore City Fire and Police Employees' Retirement System ("BCPD Retirement System"). On June 1, 1979, after leaving employment with the BCPD, Officer Muir was refunded the contributions he had made to the BCPD Retirement System.

When Officer Muir began employment with the AACPD, he became a member of the County's Retirement System.

In 1990, the Maryland General Assembly passed House Bill 687, as chapter 595, Acts 1990. The enactment added to sections 31 and 32 of what was then article 73B of the Maryland Code, governing pensions. Those sections addressed the circumstances under which a member or former member of a qualified state or local government subdivision retirement or pension plan could transfer service credit from that plan to another qualified state or local government retirement or pension plan. House Bill 687 amended the then-current law in part by creating a window of time for certain

---

III. MAY APPELLEE RECOVER UNDER AN ESTOPPEL THEORY?

IV. ARE MICHAEL VALLE'S 1991 PENSION CALCULATIONS ENTITLED TO ANY DEFERENCE?

employees who had not applied for transfers of service credit, when they could have, to do so.

On June 16, 1991, Officer Muir filed an application with the County's Office of Personnel to transfer his service credit in the BCPD Retirement System to the County's Retirement System. The County's Office of Personnel handled the "mechanics" of applications for transfers of service credit, and explained in a memorandum that an applicant whose prior service credit had been earned in a qualifying, contributory retirement plan would be required to document the pension refund the person had received. The refund then would be increased by 3% compounded interest from the date of receipt to the date of application for transfer of service credit, and the person would be required to deposit that amount into his account, "thus receiving immediate credit for any past service." Thus, for those employees, a "buy-in" was required.

Officer Muir spoke to Michael Valle, the Employee Benefits Administrator for the Office of Personnel, about his application to transfer service credit. On September 14, 1992, Mr. Valle wrote Officer Muir a letter stating that, before he could transfer service credit, he had to furnish verification of past employment and contribute the proper "buy-in" figure. Mr. Valle stated that, based on the pension contribution figure Officer Muir had made to the BCPD Retirement System, the "buy-in" figure would be $4,020.16.

Officer Muir was told by Mr. Vallee that he would receive credit with the County's Retirement System for his service with the BCPD. On September 24, 1992, Officer Muir paid the County's Retirement System the "buy-in" figure of $4,020.16. His retirement account with the County then was changed to reflect a "Pension Entry Date" of February 18, 1979. That date was arrived at by tacking Officer Muir's service time with the BCPD onto his hiring time with the AACPD.

Eight years later, by letter dated July 26, 2000, Randall J. Schultz, Personnel Officer of the County's Office of Personnel, informed Officer Muir that his service credit with the BCPD

had not been eligible for transfer because there had been a break in service between his employment by the BCPD and his employment by the AACPD, that is, the months he spent working for Westinghouse; and that the $4,020.16 Officer Muir had deposited with the County's Retirement System would be refunded to him in 90 days, without interest.

Officer Muir appealed the Office of Personnel's decision to the Board. On November 30, 2000, the Board held an evidentiary hearing on the matter. Officer Muir testified on his own behalf; the County called Andrew McCarra, a personnel analyst in the Office of Personnel; and numerous documents were admitted into evidence.

The evidence presented was consistent with the facts we have recited, which are largely undisputed. Mr. McCarra acknowledged that Officer Muir's application to transfer service credits had been accepted and approved by the County in 1992, and that he had been straightforward in the information he had furnished in support of his application. Mr. McCarra explained, however, that Mr. Valle and the Office of Personnel had misread article 73B, section 31(a), as amended by House Bill 687, to permit a transfer of service credit when the employee requesting the transfer had had a break in service between his employment by the state or local subdivision from which the service credit was to be transferred and the state or local subdivision to which the service credit would be transferred; and, in fact, the statutory language required that there be no break in service. Mr. McCarra explained that the action taken by the County's Office of Personnel in the year 2000 was to correct the mistake that had been made in allowing Officer Muir to transfer his BCPD Retirement System service credit at all.

On January 17, 2001, the Board issued a final decision and order affirming the Office of Personnel's decision but providing that the refund of Officer Muir's $4,020.16 "buy-in" sum was to be paid with interest from September 28, 1992, at the same rate of return as the County's pension plans. Two of the six Board members participating in the decision wrote a

concurrence, stating agreement with the outcome but expressing concern that Officer Muir had relied on the Office of Personnel's decision, albeit incorrect, in 1990, only to learn eight years later that the decision was wrong.

Officer Muir filed an action for judicial review in the Circuit Court for Anne Arundel County, in which the County participated as the respondent. After memoranda of law were submitted and arguments of counsel were made, the court issued a memorandum order reversing the Board's decision.

The court ruled that the language of article 73B, section 31(a), as amended by House Bill 687, was ambiguous, and could have been properly interpreted to have allowed a transfer of retirement service credit for an employee who had had a break in service; that the County's statutory interpretation therefore was not a mistake, and the action it took in the year 2000 was not the correction of a mistake; and that, under the doctrine of equitable estoppel, the County was precluded from undoing the transfer of service credit it had approved for Officer Muir eight years earlier.

The County noted a timely appeal.

We shall include additional facts in our discussion as pertinent to the issues.

## STANDARD OF REVIEW

In a circuit court action for judicial review, under Md.Code (1999 Repl.Vol.), section 10–222(h)(3) of the State Government Article, the court may reverse or modify the agency's final decision "if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision" was unconstitutional; "exceed[ed] the statutory authority or jurisdiction of the [agency]"; "result[ed] from an unlawful procedure"; was "affected by any other error of law"; was "unsupported by competent, material, and substantial evidence in light of the entire record as submitted"; or was "arbitrary or capricious."

In *Stover v. Prince George's County,* 132 Md.App. 373, 752 A.2d 686 (2000), we explained that, on appeal from the decision of a circuit court in an action for judicial review of the final decision of an administrative agency, this Court performs the same function as did the circuit court:

When reviewing a decision of an administrative agency, this Court's role is "precisely the same as that of the circuit court." *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–304, 641 A.2d 899 (1994) (citation omitted). "Judicial review of administrative agency action is narrow. The court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the administrative agency.'" *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–577, 650 A.2d 226 (1994) (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978)).

Rather, "[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test." *Department of Health and Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." *Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). The court cannot substitute its judgment for that of the agency, but instead must exercise a "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *State Administration Board of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989) (quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988)).

The reviewing court's analysis has three parts:

1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, *i.e.,* by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. At this juncture, ... "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]."

*Comptroller of the Treasury v. World Book Childcraft Int'l, Inc.,* 67 Md.App. 424, 438–439, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986) (quoting *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834–838, 490 A.2d 1296 (1985)).

*Id.* at 380–81, 752 A.2d 686.

## DISCUSSION

### I

The County contends the circuit court erroneously interpreted article 73B, section 31(a), as amended by House Bill

687, as having permitted Officer Muir to transfer the service credit he earned in the BCPD Retirement System to the County Retirement System when there was a break between the end of his service with the BCPD and the beginning of his service with the AACPD; and that the Board properly interpreted the statute as not having permitted a transfer of service credit in that circumstance. Officer Muir counters that the circuit court's decision on that issue was legally correct and the Board's decision was legally incorrect.

During the relevant period in this case, the statutes pertaining to government pensions were codified in article 73B of the Maryland Code. Sections 31 through 34 of that article appeared under the heading "Transfers Between Retirement or Pension Systems." In 1989, before the passage of House Bill 687 during the 1990 legislative session, section 31 of article 73B, entitled "Acceptance of employment requiring participation in another system[,]" read as follows:

> *Any person who is a member of any retirement or pension system,* operated on an actuarial basis, with contributions being made during the active service of members which are computed to be sufficient to provide the reserves needed to cover the benefits payable on their account, either under the laws of this State or under the laws of any political subdivision of this State, *may transfer that membership to any other such retirement or pension system upon accepting office or employment which makes it possible or mandatory for the member to participate in the other system and if acceptance of the office or employment would make it impossible for the member to continue as a contributing member of the retirement system from which the member transfers.*

(Emphasis added.)

House Bill 687 did not change this language. It recodified it as subsection 31(a), and assigned it the subcaption, "Acceptance of employment requiring participation in another system." House Bill 687 added a new subsection, however, which

was codified as subsection 31(b). The new section, which was given the subcaption, "Transfers by former members," stated:

> *Any person who is a former member of any retirement or pension system,* operated on an actuarial basis, with contributions being made during the active service of members which are computed to be sufficient to provide the reserves needed to cover the benefits payable on the member's account, either under the laws of the state or under the laws of any political subdivision of the state, *may transfer service credit attained as a result of that former membership to any other such retirement or pension system if:*
>
> *(1) The former member served as an elected or appointed official as a member of the retirement or pension system from which the service credit is to be transferred;*
>
> *(2) The former member is serving as an elected or appointed official of the state at the time of a request for the transfer of service credit;*
>
> *(3) A break in service occurred that prevents the former member from transferring membership under subsection (A) of this section; and*
>
> *(4) The current office of the former member makes it: (I) Possible or mandatory to participate in the retirement or pension system to which the service credit is to be transferred; and (II) Impossible for the member to continue as a contributing member of the retirement or pension system from which the service credit is to be transferred.*

(Emphasis added.) After subsection 31(b) was added, the caption of section 31 was amended to read: "Acceptance of employment requiring participation in another system; transfers by former members."

Also before House Bill 687 was passed, section 32 of article 73B governed transfers of service credit between certain types of pension or retirement systems. Specifically, it categorized the systems as those in which contributions were deducted on all earnable compensation or those in which contributions are

not deducted on all earnable compensation, and then in four subsections, (a) through (d), addressed the four possible eventualities of transfers from or to those systems. (Transfer from system in which contributions deducted on all earnable compensation to like system; transfer from system in which contributions deducted on all earnable compensation to system in which contributions not so deducted; the converse situation; and transfer from system in which contributions not deducted on all earnable compensation to like system.) For each eventuality, the statute set forth a deadline by which the transfer of service credit had to take place, if at all.

For purposes relevant to this case, House Bill 687 amended section 32 to add a new subsection (e), governing "Transfers by former members[,]" that corresponded to the addition of subsection 31(b). Subsection 32(e) provided, in pertinent part, that if service credit was transferred under subsection 31(b) "for a former member of a retirement or pension system, the former member shall receive the service credit for and in the amount of benefits in the system to which the member transfers[,]" subsection 32(e)(1), and that any claim for service credit had to be made on or before the later of July 1, 1991, or one year after the former member became a member of the retirement system into which service credit was to be transferred. Subsection 32(e)(2)(i) and (ii).

Finally, section 2 of House Bill 687 stated:

That any member of a retirement or pension system operated on an actuarial basis by the State or a political subdivision of the State may make a claim on or before June 30, 1991 for service credit, if the member (1) On or before June 30, 1990, transferred from a retirement or pension system operated on an actuarial basis by the State or a political subdivision of the State to a retirement or pension system operated on an actuarial basis by the State or a political subdivision of the State; and (2) At the time of the transfer is eligible to claim service credit under Article 73B, § 32 of the Annotated Code of Maryland or under Chapter 327 of the Acts of the General Assembly of 1986.

The issue of the meaning of sections 31 and 32 of article 73B, as amended by House Bill 687, is a pure question of law that we review de novo. *Total Audio–Visual Systems v. DLLR,* 360 Md. 387, 394, 758 A.2d 124 (2000). The primary goal of statutory interpretation is to determine and put into effect the intention of the legislature. *In re Mark M.,* 365 Md. 687, 711, 782 A.2d 332 (2001). Because the best evidence of a statute's meaning is the statute itself, the process of statutory interpretation "begins with, and frequently ends with, the words of the statute." *Total Audio–Visual Systems v. DLLR, supra,* 360 Md. at 395, 758 A.2d 124.

We interpret the words of a statute by using their plain meaning. *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424 (1997). When statutory terms are unambiguous, we will give them plain and sensible meaning. *Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace,* 337 Md. 338, 345, 653 A.2d 468 (1995), and ordinarily will not look beyond the words of the statute to determine the legislative intent. *Board of License Commissioners for Charles County, Maryland v. Toye,* 354 Md. 116, 122, 729 A.2d 407 (1999). Moreover, we "give every word effect, avoiding constructions that render any portion of the language superfluous or redundant." *Rouse–Fairwood Ltd. v. Supervisor of Assessments,* 120 Md. App. 667, 687, 708 A.2d 19 (1998) (citing *Blondell v. Baltimore City Police Dep't,* 341 Md. 680, 691, 672 A.2d 639 (1996)).

When the plain meaning of a statute is not clear, we consider not only the literal and usual meaning of the words but also their meaning and effect "in light of the setting, the objectives and purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). "When construing a statutory provision within a single statutory scheme, we must consider the statutory scheme as a whole to determine the legislative intent." *In re Mark M.,* 365 Md. at 711, 782 A.2d 332. Finally, we must avoid "giving the statute a strained interpretation or one that reaches an

absurd result." *Metheny v. State,* 359 Md. 576, 610, 755 A.2d 1088 (2000).

The language of section 31(a) is written so as to inform a member of a qualifying governmental retirement or pension system who has earned service credit in that system about the possibility of transferring that credit upon acceptance by the member of certain office or employment. Specifically, it allows such a member to "transfer that membership" to any other such qualifying governmental system, "upon accepting office or employment which makes it possible or mandatory for the member to participate in the other system and if acceptance of the office or employment would make it impossible for the member to continue as a contributing member of the retirement system from which the member transfers." Thus, for a person to transfer membership under section 31(a), he must 1) be a member of a qualifying system; 2) either be able or be required to participate in the other qualifying system when he accepts his new office or employment; *and* 3) no longer be able to continue as a contributing member of the first retirement system when he accepts his new office or employment.

When these criteria are considered together, it is clear that only when a person went directly from holding employment or office with one governmental entity having a qualified retirement system to holding employment or office with another such entity would he qualify for transfer of service credit under section 31(a). The temporal focus of the statute is "upon accepting office or employment." At that time, the person in question must be a member of the retirement system of his existing governmental employer; must be a contributing member of that system; must not be able to continue as a contributing member once his employment changes; and must be permitted or required to participate in his new governmental employer's pension system once he changes employment. Those criteria cannot be satisfied by a member of a qualified system who leaves employment to join the private sector. Even if the person could remain a member

of the first system, and even if he could remain a contributing member, both of which are unlikely, his acceptance of the new employment would not provide him with a new qualifying system to participate in. The only circumstance in which all criteria could be satisfied is when there is no break in qualified government service.

The language of section 31(b) is consistent with this interpretation of section 31(a), and indeed compels it. Unlike section 31(a) which pertains to people who are members of qualifying governmental retirement or pension systems, section 31(b) pertains to people who are former members of such retirement or pension systems.

A comparison of the two subsections shows that the statutory right of a former member of an applicable retirement or pension system to transfer service credit earned in that system to another qualifying system is more narrow than the right of a member of an applicable retirement or pension system to so transfer service credit, and that four specific conditions must be fulfilled for the right to exist. They are:

(1) The former member served as an elected or appointed official as a member of the retirement or pension system from which the service credit is to be transferred;

(2) The former member is serving as an elected or appointed official of the State at the time of a request for the transfer of service credit;

(3) *A break in service occurred that prevents the former member from transferring membership under subsection (a) of this section;* and

(4) The current office of the former member makes it:

(i) Possible or mandatory for the former member to participate in the retirement or pension system to which the service credit is to be transferred; and

(ii) Impossible for the member to continue as a contributing member of the retirement or pension system to from which the service credit is to be transferred.

This language is an express recognition by the legislature that the wording of section 31(a), which as noted had existed in the law before House Bill 687 was passed, by its terms required that there not be a break in service between holding employment or office with the two governmental entities for a transfer of benefits to be permitted.

In the case at bar, it was undisputed that Officer Muir only could have been eligible for a transfer of service credit under section 31(a), if at all. Clearly, he did not meet all four of the conditions required for eligibility under section 31(b). Yet, the plain meaning of section 31(a) eliminated him from its coverage, because of the break in service between his employments by the BCPD and by the AACPD. The facts introduced into evidence showed plainly how the break in service disqualified Officer Muir from eligibility.

First, under Article 22, sections 29 through 41 of the Baltimore City Code ("Code"), which establishes the BCPD Retirement System, Officer Muir ceased being a member of that system when he was refunded his contributions, on June 1, 1979. Code section 30(3) provides that a " '[m]ember' shall mean any person included in the membership of the [BCPD Retirement System] as provided in § 31 of this subtitle." Section 30(3). And Code section 31 describes the membership in the BCPD Retirement System as consisting of people who become employees after a certain date, Code section 31(1)(a),[2] *but*

Should any member . . . withdraw his accumulated contributions . . . he shall thereupon cease to be a member.

Code section 31(4). Thus, when Officer Muir accepted employment with the AACPD in 1980, he no longer was a member of the BCPD Retirement System, having been refunded his accumulated contributions on June 1, 1979; and, necessarily, he no longer was a contributing member of that

---

2. Code section 30(2)(a)(1) states that an "employee" means an "officer or employee of the Police Department or Fire Department of Baltimore City . . . ."

retirement system.[3] And second, upon accepting employment with Westinghouse, Officer Muir was neither required nor eligible to participate in the qualified retirement system to which he later sought to transfer his service credit.

The amendment to section 32, governing the time period in which former members could make a claim for transfer of service credit, did not pertain to Officer Muir, because he was not eligible for transfer of service credit as a former member, as explained above. Finally, section 2 of House Bill 687 also was inapplicable to Officer Muir. That section, which we have quoted above, and which appears as an "Editor's note" in the commentary to article 73B, section 39, afforded an extension of time to make a claim to transfer service credit to members of retirement systems who were eligible to have their service credit transferred, but did not make their claims within the applicable time frames established in section 32. Officer Muir was not eligible to have his service credit transferred to begin with, so the section did not apply to him.

The plain language of article 73B, sections 31 and 32, did not allow Officer Muir to transfer his service credit. The Board's interpretation of that language was legally correct.

## II

The County contends the Board properly concluded that, notwithstanding that Michael Valle told Officer Muir in 1992 that he could transfer his service credit, and that the County approved his doing so and accepted the payment to effectuate the transfer, the County was not estopped to deny Officer Muir the benefit of transferring his service credit. In sup-

---

3. In the "Claim for Transfer of Service Credit," filed by Officer Muir with the BCPD Retirement System and introduced into evidence, Officer Muir gave his "termination of membership" date from that retirement system as April 26, 1979. He further answered "Yes" to the question, "Have accumulated contributions and interest been refunded to [you] by your system?"; and answered that the amount refunded was $2,819.66, with the sum having been refunded to him on June 1, 1979. That information was certified by an authorized official of the BCPD Retirement System, on November 11, 1991.

port, the County argues that the doctrine of equitable estoppel does not operate to preclude a governmental entity from correcting a mistake or clerical error in determining a pension calculation, and that is what the County was doing with respect to Officer Muir.

Officer Muir responds that the County was not correcting a mistake or clerical error but was reinterpreting a statute that was subject to differing interpretations, which it is estopped to do.

The Court of Appeals has

adopted and continually applied the definition of equitable estoppel set forth at 3 J. Pomeroy, *Equity Jurisprudence,* § 804 (5th ed., 1941), as follows:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Permanent Financial Corp. v. Montgomery County,* 308 Md. 239, 247, 518 A.2d 123 (1986).

Ordinarily, the doctrine of estoppel does not apply against the State. *ARA Health Services, Inc. v. Dep't of Public Safety,* 344 Md. 85, 96, 685 A.2d 435 (1996); *Marriott v. Cole,* 115 Md.App. 493, 508, 694 A.2d 123 (1997) (stating that the doctrine of estoppel "ordinarily does not apply against the State or its agencies with respect to governmental functions"). The law is not settled, however, "as to when, and under what circumstances, equitable estoppel is available against a municipal corporation." *Permanent Financial Corp., supra,* 308 Md. at 247, 518 A.2d 123.

In Maryland, in a non-chartered county, the county commissioners are held to be a municipal corporation, under

Md.Code (2001 Repl.Vol.), article 25, section 1. *See Neuen-schwander v. Wash. Sub. San. Comm'n.*, 187 Md. 67, 74–75, 48 A.2d 593 (1946); *Jay v. County Comm'rs*, 120 Md. 49, 52, 87 A. 521 (1913); *Gregg Neck Yacht Club v. Co. Comm'rs of Kent County*, 137 Md.App. 732, 774, 769 A.2d 982 (2001). Likewise, under article 25A, section 4, in chartered counties, "Article 25 shall continue to be operative." Accordingly, for purposes of the doctrine of equitable estoppel, the chartered counties of Maryland are treated as municipal corporations. *See Perma-nent Financial Corp. v. Montgomery County, supra*, 308 Md. at 247, 518 A.2d 123 (addressing application of doctrine of equitable estoppel against Montgomery County); *Schaefer v. Anne Arundel County*, 17 F.3d 711, 714 (4th Cir.1994) (Niem-eyer, J.) (addressing application of the doctrine of equitable estoppel against Anne Arundel County and describing that county as "a municipal corporation"). Thus, in the case at bar, we look to the law of estoppel as applied to municipal corpora-tions (albeit unsettled) for the legal principles guiding our decision.

■ In Maryland, the doctrine of equitable estoppel has been applied "narrowly" to municipal corporations. *Perma-nent Financial Corp., supra*, 308 Md. at 249, 518 A.2d·123. The failure of a municipal officer to act will not effect an estoppel. *Id.* at 248–49, 518 A.2d 123 (quoting 9A McQuillen, Municipal Corporations, § 27.56 (3rd. ed. rev.)). Rather, "there must have been some positive acts by such officers that have induced the action of the adverse party" and "[i]t must appear, moreover, that the party asserting the doctrine in-curred a substantial change of position or made extensive expenditures in reliance on the act." *Id.* at 249, 518 A.2d 123.

■ A municipality may be estopped to deny the actions of its officers when they were taken within the scope and course of their actual authority. *Lipsitz v. Parr*, 164 Md. 222, 227, 164 A. 743 (1933). *See also Marzullo v. Kahl*, 366 Md. 158, 196, 783 A.2d 169 (2001); *Inlet Assocs. v. Assateague House Condo. Assoc'n.*, 313 Md. 413, 435–36, 545 A.2d 1296 (1988); *Permanent Financial Corp. v. Montgomery County*,

*supra,* 308 Md. at 250, 518 A.2d 123. On the other hand, estoppel will not apply to an act of a municipal corporation's officer that is outside his actual authority, *see Gregg Neck Yacht Club v. Co. Comm'rs of Kent County, supra,* 137 Md.App. at 775, 769 A.2d 982; *see also Maryland Classified Employees Assoc. v. Anderson, supra,* 281 Md. at 501 n. 2, 380 A.2d 1032 (*citing Gontrum v. Baltimore,* 182 Md. 370, 378, 35 A.2d 128 (1943)), or that is taken in violation of the law. *Marzullo v. Kahl, supra,* 366 Md. at 196–97, 783 A.2d 169; *Permanent Financial Corp. v. Montgomery County, supra,* 308 Md. at 250, 518 A.2d 123; *Gregg Neck Yacht Club v. Co. Comm'rs of Kent County, supra,* 137 Md.App. at 775, 769 A.2d 982.

In *Permanent Financial Corporation,* the Court discussed the application *vel non* of the doctrine of equitable estoppel to a middle ground type of situation, aptly described in *Jantausch v. Borough of Verona,* 41 N.J.Super. 89, 124 A.2d 14, 16–17 (1956), as follows:

But what of the intermediate situation in which the administrative official in good faith and within the ambit of his duty makes an erroneous and debatable interpretation of the ordinance and the [person affected] in like good faith relies thereon?

308 Md. at 250, 518 A.2d 123 (quoting *Jantausch v. Borough of Verona, supra,* 124 A.2d at 16–17). The Court of Appeals pointed out that this question was answered in a later New Jersey case, which held that the doctrine would apply so long as the meaning of the ordinance, "although ultimately not too debatable, yet was, when the [action was taken], sufficiently substantial to render doubtful a charge that the administrative official acted *without any reasonable basis* or. that the [person relying on the official's act] proceeded without good faith." 308 Md. at 250, 518 A.2d 123 (quoting *Jesse A. Howland & Sons, v. Borough of Freehold,* 143 N.J.Super. 484, 363 A.2d 913, 916, (1976) (emphasis in original)).

This analysis ultimately was adopted by the Court of Appeals in *City of Hagerstown v. Long Meadow,* 264 Md. 481–

493, 287 A.2d 242 (1972), in which the plaintiffs claimed the municipality was estopped to take the position that they needed to obtain a building permit for a project, when an officer of the municipality had represented otherwise. The Court held:

> Nor do we think the facts of this case permit the successful use of the argument that the Building Inspector was following a long standing administrative interpretation when he informed [the plaintiffs] that no building permit was required. This rule, when applicable, must be bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance, which latter element is not here present.

*Id.* at 493, 287 A.2d 242.

The Court once again applied this principle in *Permanent Financial Corp. v. Montgomery County, supra.* In that case, the Court concluded that a county ordinance defining "nonhabitable structures" was "open to at least two reasonable and debatable interpretations[,]" concerning height limitations, and that for a significant period of time, the county had consistently adopted and applied one of those interpretations. 308 Md. at 251, 518 A.2d 123. A county official acting within the scope of his authority communicated that interpretation to the plaintiff builder, which relied on it and designed the building involved using the height limitations as interpreted by the county. Later, the county board of appeals determined that that interpretation was incorrect. The Court concluded, however, that the long-standing interpretation of the ordinance by the county "was nevertheless reasonable and debatable ... [and that it was clear that the county's action in issuing a permit to the plaintiff based on that interpretation] was not the result of oversight by the [c]ounty, but rather was consistent with its practice." *Id.* at 252, 518 A.2d 123. On that basis, the Court held because the plaintiff builder had expended substantial funds in reliance of the county's action, the county was estopped to deny the validity of its action. *Id.* at 252–53, 518 A.2d 123.

When we apply this principle to the case at bar, we conclude that the County is not estopped to deny the actions of Michael Valle and other members of its Office of Personnel approving Officer Muir's transfer of service credit. Sections 31 and 32 of article 73B, originally and as amended by House Bill 687, did not allow a transfer of service credit for a person in Officer Muir's circumstance, as we have explained in part I above. These statutes were not ambiguous; by their plain language, Officer Muir was not eligible to transfer service credit. Unlike the ordinance in *Permanent Financial Corp. v. Montgomery County, supra,* the pertinent statutes here were not subject to reasonable debate and interpretation with respect to a person in Officer Muir's position.

The County did not adopt one possible reasonable interpretation of the statutes in question for a substantial period of time and then, after Officer Muir and perhaps others had relied on it, change its favored interpretation to another reasonable, but different, one. Rather, the County's officials incorrectly read the statutes to mean something they plainly did not mean. The Board correctly concluded that the action the County took in 2000 to inform Officer Muir that the transfer of service credit ostensibly effected in 1992 was not properly done, and to return his "buy-in" payment, was taken to correct a mistake its officials had committed in reading and applying the pertinent sections of article 73B, and was not a new interpretation of otherwise ambiguous statutory language. The County acted within its authority to correct the mistake, *see Redding v. Bd. of County Comm'rs,* 263 Md. 94, 111, 282 A.2d 136 (1971), *cert. denied,* 406 U.S. 923, 92 S.Ct. 1791, 32 L.Ed.2d 124 (1972) (citing *Zoning Appeals Bd. v. McKinney,* 174 Md. 551, 564–566, 199 A. 540 (1938)), and was not estopped to deny the effectiveness of the erroneous transfer of service credit.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED WITH INSTRUCTIONS TO AFFIRM THE FINAL AGEN-**

CY ACTION OF THE ANNE ARUNDEL COUNTY BOARD OF APPEALS.

COSTS TO BE PAID BY THE APPELLEE.